# MU'MIN *v.* VIRGINIA

No. 90–5193.   Argued February 20, 1991—Decided May 30, 1991

416

REHNQUIST, C. J., delivered the opinion of the Court, in which WHITE, O'CONNOR, SCALIA, and SOUTER, JJ., joined. O'CONNOR, J., filed a concurring opinion, *post*, p. 432. MARSHALL, J., filed a dissenting opinion, in all but Part IV of which BLACKMUN and STEVENS, JJ., joined, *post*, p. 433. KENNEDY, J., filed a dissenting opinion, *post*, p. 448.

*John H. Blume*, by appointment of the Court, 498 U. S. 936, argued the cause for petitioner. With him on the briefs was *Mark E. Olive*.

*John H. McLees, Jr.*, Assistant Attorney General of Virginia, argued the cause for respondent. With him on the brief were *Mary Sue Terry*, Attorney General, *H. Lane Kneedler*, Chief Deputy Attorney General, *Stephen D. Rosenthal*, Deputy Attorney General, *Jerry P. Slonaker*, Senior Assistant Attorney General, and *Thomas C. Daniel*, Assistant Attorney General.*

CHIEF JUSTICE REHNQUIST delivered the opinion of the Court.

Petitioner Dawud Majid Mu'Min was convicted of murdering a woman in Prince William County, Virginia, while out of prison on work detail, and was sentenced to death. The case engendered substantial publicity, and 8 of the 12 venirepersons eventually sworn as jurors answered on *voir dire* that they had read or heard something about the case. None of those who had read or heard something indicated that they had formed an opinion based on the outside information, or that it would affect their ability to determine petitioner's guilt or innocence based solely on the evidence presented at trial. Petitioner contends, however, that his Sixth Amendment right to an impartial jury and his right to due process under the Fourteenth Amendment were violated because the trial judge refused to question further prospective jurors about the specific contents of the news reports to which they had been exposed. We reject petitioner's submission.

*Kenneth M. Mogill* filed a brief for the National Jury Project as *amicus curiae* urging reversal.

Mu'Min was an inmate at the Virginia Department of Corrections' Haymarket Correctional Unit serving a 48-year sentence for a 1973 first-degree murder conviction. On September 22, 1988, he was transferred to the Virginia Department of Transportation (VDOT) Headquarters in Prince William County and assigned to a work detail supervised by a VDOT employee. During his lunch break, he escaped over a perimeter fence at the VDOT facility and made his way to a nearby shopping center. Using a sharp instrument that he had fashioned at the VDOT shop, Mu'Min murdered and robbed Gladys Nopwasky, the owner of a retail carpet and flooring store. Mu'Min then returned to his prison work crew at the VDOT, discarding his bloodied shirt and the murder weapon near the highway.

About three months before trial, petitioner submitted to the trial court, in support of a motion for a change of venue, 47 newspaper articles relating to the murder.[1] One or more of the articles discussed details of the murder and investigation, and included information about petitioner's prior criminal record, App. 963–969, the fact that he had been rejected for parole six times, *id.*, at 923, 942, accounts of alleged prison infractions, *id.*, at 921, 931, 942, details about the prior murder for which Mu'Min was serving his sentence at the time of this murder, *id.*, at 948, 951, a comment that the death penalty had not been available when Mu'Min was convicted for this earlier murder, *id.*, at 948, and indications that Mu'Min had confessed to killing Gladys Nopwasky, *id.*, at 975. Several articles focused on the alleged laxity in the supervision of work gangs, *id.*, at 922–924, 930–931, and argued for reform of the prison work-crew system, *id.*, at 974. The trial judge deferred ruling on the venue motion until after

---

[1] The articles had been published between September 26, 1988, and January 14, 1989. More than half of them appeared in the Potomac News, a daily paper with circulation of only 25,000, and the remainder were printed in the Washington Post and several other local newspapers. See App. in No. 890899 (Sup. Ct. Va.) 921–975 (App.).

making an attempt to seat a jury, Joint Appendix 8–15 (J. A.).

Shortly before the date set for trial, petitioner submitted to the trial judge 64 proposed *voir dire* questions,[2] *id.*, at 2–7, and filed a motion for individual *voir dire*. The trial court denied the motion for individual *voir dire;* it ruled that *voir dire* would begin with collective questioning of the venire, but the venire would be broken down into panels of four, if necessary, to deal with issues of publicity, *id.*, at 16–17. The trial court also refused to ask any of petitioner's proposed questions relating to the content of news items that potential jurors might have read or seen.

Twenty-six prospective jurors were summoned into the courtroom and questioned as a group, *id.*, at 42–66. When asked by the judge whether anyone had acquired any information about the alleged offense or the accused from the news media or from any other source, 16 of the potential jurors replied that they had, *id.*, at 46–47. The prospective jurors were not asked about the source or content of prior knowledge, but the court then asked the following questions:

---

[2] The court approved 24 of the proposed questions, but did not allow the following questions regarding the content of what jurors had read or heard about the case (J. A. 17–41):

"32. What have you seen, read or heard about this case?

"33. From whom or what did you get this information?

"34. When and where did you get this information?"

"38. What did you discuss?"

"41. Has anyone expressed any opinion about this case to you?

"42. Who? What? When? Where?"

The trial court did ask several of the requested questions concerning prior knowledge of the case:

"31. Have you acquired any information about this case from the newspapers, television, conversations, or any other source?"

"35. Have you discussed this case with anyone?

"36. With whom?

"37. When and where?"

"Would the information that you heard, received, or read from whatever source, would that information affect your impartiality in this case?

"Is there anyone that would say what you've read, seen, heard, or whatever information you may have acquired from whatever the source would affect your impartiality so that you could not be impartial?

. . . . .

"Considering what the ladies and gentlemen who have answered in the affirmative have heard or read about this case, do you believe that you can enter the Jury box with an open mind and await until the entire case is presented before reaching a fixed opinion or conclusion as to the guilt or innocence of the accused?

. . . . .

". . . In view of everything that you've seen, heard, or read, or any information from whatever source that you've acquired about this case, is there anyone who believes that you could not become a Juror, enter the Jury box with an open mind and wait until the entire case is presented before reaching a fixed opinion or a conclusion as to the guilt or innocence of the accused?" *Id.*, at 47–48.

One of the 16 panel members who admitted to having prior knowledge of the case answered in response to these questions that he could not be impartial, and was dismissed for cause, *id.*, at 48–49. Petitioner moved that all potential jurors who indicated that they had been exposed to pretrial publicity be excused for cause, *id.*, at 68. This motion was denied, *id.*, at 69, as was petitioner's renewed motion for a change of venue based on the pretrial publicity, *id.*, at 71.

The trial court then conducted further *voir dire* of the prospective jurors in panels of four, *id.*, at 72–94. Whenever a potential juror indicated that he had read or heard something about the case, the juror was then asked whether he had formed an opinion and whether he could nonetheless be im-

partial. None of those eventually seated stated that he had formed an opinion or gave any indication that he was biased or prejudiced against the defendant. All swore that they could enter the jury box with an open mind and wait until the entire case was presented before reaching a conclusion as to guilt or innocence.

If any juror indicated that he had discussed the case with anyone, the court asked follow-up questions to determine with whom the discussion took place and whether the juror could have an open mind despite the discussion. One juror who equivocated as to whether she could enter the jury box with an open mind was removed *sua sponte* by the trial judge, *id.*, at 90. One juror was dismissed for cause because she was not "as frank as she could [be]" concerning the effect of her feelings toward members of the Islamic Faith and toward defense counsel, *id.*, at 81. One juror was dismissed because of her inability to impose the death penalty, *id.*, at 86–87, while another was removed based upon his statement that upon a finding of capital murder, he could not consider a penalty less than death, App. 339–341. The prosecution and the defense each peremptorily challenged 6 potential jurors, and the remaining 14 were seated and sworn as jurors (two as alternates). Petitioner did not renew his motion for change of venue or make any other objection to the composition of the jury. Of the 12 jurors who decided petitioner's case, 8 had at one time or another read or heard something about the case. None had indicated that he had formed an opinion about the case or would be biased in any way.

The jury found petitioner guilty of capital murder and recommended that he be sentenced to death. After taking the matter under advisement and reviewing a presentence report, the trial judge accepted the jury's recommendation and sentenced Mu'Min to death. Mu'Min appealed, contending that he was entitled to a new trial as a result of the judge's failure to permit the proposed *voir dire* questions. By a divided vote, the Supreme Court of Virginia affirmed his con-

viction and sentence, finding that, while a criminal defendant may properly ask on *voir dire* whether a juror has previously acquired any information about the case, the defendant does not have a constitutional right to explore the *content* of the acquired information. Rather, an accused is only entitled to know whether the juror can remain impartial in light of the previously obtained information. 239 Va. 433, 443, 389 S. E. 2d 886, 893 (1990). We granted certiorari, 498 U. S. 894 (1990), and now affirm.

Our cases dealing with the requirements of *voir dire* are of two kinds: those that were tried in federal courts, and are therefore subject to this Court's supervisory power, see *Rosales-Lopez* v. *United States*, 451 U. S. 182 (1981); *Aldridge* v. *United States*, 283 U. S. 308 (1931); and *Connors* v. *United States*, 158 U. S. 408 (1895); and those that were tried in state courts, with respect to which our authority is limited to enforcing the commands of the United States Constitution. See *Turner* v. *Murray*, 476 U. S. 28 (1986); *Ristaino* v. *Ross*, 424 U. S. 589 (1976); and *Ham* v. *South Carolina*, 409 U. S. 524 (1973).

A brief review of these cases is instructive. In *Connors*, we said:

> "[A] suitable inquiry is permissible in order to ascertain whether the juror has any bias, opinion, or prejudice that would affect or control the fair determination by him of the issues to be tried. That inquiry is conducted under the supervision of the court, and a great deal must, of necessity, be left to its sound discretion. This is the rule in civil cases, and the same rule must be applied in criminal cases." 158 U. S., at 413.

In *Aldridge* v. *United States*, *supra*, counsel for a black defendant sought to have the Court put a question to the jury as to whether any of them might be prejudiced against the defendant because of his race. We held that it was reversible error for the Court not to have put such a question, saying "[t]he Court failed to ask any question which could be

deemed to cover the subject." *Id.*, at 311. More recently, in *Rosales-Lopez* v. *United States, supra,* we held that such an inquiry as to racial or ethnic prejudice need not be made in every case, but only where the defendant was accused of a violent crime and the defendant and the victim were members of different racial or ethnic groups. We said:

> "Because the obligation to empanel an impartial jury lies in the first instance with the trial judge, and because he must rely largely on his immediate perceptions, federal judges have been accorded ample discretion in determining how best to conduct the *voir dire.*" *Id.*, at 189.

Three of our cases dealing with the extent of *voir dire* examination have dealt with trials in state courts. The first of these was *Ham* v. *South Carolina, supra.* In that case, the defendant was black and had been active in the civil rights movement in South Carolina; his defense at trial was that enforcement officers were "out to get him" because of his civil rights activities, and that he had been framed on the charge of marijuana possession of which he was accused. He requested that two questions be asked regarding racial prejudice and one question be asked regarding prejudice against persons, such as himself, who wore beards. We held that the Due Process Clause of the Fourteenth Amendment required the court to ask "either of the brief, general questions urged by the petitioner" with respect to race, *id.*, at 527, but rejected his claim that an inquiry as to prejudice against persons with beards be made, "[g]iven the traditionally broad discretion accorded to the trial judge in conducting *voir dire* . . . ." *Id.*, at 528.

In *Ristaino* v. *Ross, supra,* we held that the Constitution does not require a state-court trial judge to question prospective jurors as to racial prejudice in every case where the races of the defendant and the victim differ, but in *Turner* v. *Murray, supra,* we held that in a capital case involving a

charge of murder of a white person by a black defendant such questions must be asked.

We enjoy more latitude in setting standards for *voir dire* in federal courts under our supervisory power than we have in interpreting the provisions of the Fourteenth Amendment with respect to *voir dire* in state courts. But two parallel themes emerge from both sets of cases: First, the possibility of racial prejudice against a black defendant charged with a violent crime against a white person is sufficiently real that the Fourteenth Amendment requires that inquiry be made into racial prejudice; second, the trial court retains great latitude in deciding what questions should be asked on *voir dire*. As we said in *Rosales-Lopez, supra:*

> "Despite its importance, the adequacy of *voir dire* is not easily subject to appellate review. The trial judge's function at this point in the trial is not unlike that of the jurors later on in the trial. Both must reach conclusions as to impartiality and credibility by relying on their own evaluations of demeanor evidence and of responses to questions." *Id.,* at 188.

Petitioner asserts that the Fourteenth Amendment requires more in the way of *voir dire* with respect to pretrial publicity than our cases have held that it does with respect to racial or ethnic prejudice. Not only must the court "cover the subject," *Aldridge, supra,* at 311, but it must make precise inquiries about the contents of any news reports that potential jurors have read. Petitioner argues that these "content" questions would materially assist in obtaining a jury less likely to be tainted by pretrial publicity than one selected without such questions. There is a certain commonsense appeal to this argument.

Undoubtedly, if counsel were allowed to see individual jurors answer questions about exactly what they had read, a better sense of the juror's general outlook on life might be revealed, and such a revelation would be of some use in exercising peremptory challenges. But, since peremptory

challenges are not required by the Constitution, *Ross* v. *Oklahoma*, 487 U. S. 81, 88 (1988), this benefit cannot be a basis for making "content" questions about pretrial publicity a constitutional requirement. Such questions might also have some effect in causing jurors to reevaluate their own answers as to whether they had formed any opinion about the case, but this is necessarily speculative.

Acceptance of petitioner's claim would require that each potential juror be interrogated individually; even were the interrogation conducted in panels of four jurors, as the trial court did here, descriptions of one juror about pretrial publicity would obviously be communicated to the three other members of the panel being interrogated, with the prospect that more harm than good would be done by the interrogation. Petitioner says that the questioning can be accomplished by juror questionnaires submitted in advance at trial, but such written answers would not give counsel or the court any exposure to the demeanor of the juror in the course of answering the content questions. The trial court in this case expressed reservations about interrogating jurors individually because it might make the jurors feel that they themselves were on trial. While concern for the feelings and sensibilities of potential jurors cannot be allowed to defeat inquiry necessary to protect a constitutional right, we do not believe that "content" questions are constitutionally required.

Whether a trial court decides to put questions about the content of publicity to a potential juror or not, it must make the same decision at the end of the questioning: is this juror to be believed when he says he has not formed an opinion about the case? Questions about the content of the publicity to which jurors have been exposed might be helpful in assessing whether a juror is impartial. To be constitutionally compelled, however, it is not enough that such questions might be helpful. Rather, the trial court's failure to ask these

questions must render the defendant's trial fundamentally unfair. See *Murphy* v. *Florida*, 421 U. S. 794, 799 (1975).

*Aldridge* was this Court's seminal case requiring inquiry as to racial prejudice, and the opinion makes clear that in reaching that result we relied heavily on a unanimous body of state-court precedents holding that such an inquiry should be made. 283 U. S., at 311–313. On the subject of pretrial publicity, however, there is no similar consensus, or even weight of authority, favoring petitioner's position. Among the state-court decisions cited to us by the parties, not only Virginia, but South Carolina, *State* v. *Lucas*, 285 S. C. 37, 39–40, 328 S. E. 2d 63, 64–65, cert. denied, 472 U. S. 1012 (1985), Massachusetts, *Commonwealth* v. *Burden*, 15 Mass. App. 666, 674, 448 N. E. 2d 387, 393 (1983), and Pennsylvania, *Commonwealth* v. *Dolhancryk*, 273 Pa. Super. 217, 222, 417 A. 2d 246, 248 (1979), have refused to adopt such a rule. The Courts of Appeals for the Fifth Circuit, *United States* v. *Davis*, 583 F. 2d 190, 196 (1978), the Seventh Circuit, *United States* v. *Dellinger*, 472 F. 2d 340, 375–376 (1972), cert. denied, 410 U. S. 970 (1973), and the Ninth Circuit, *Silverthorne* v. *United States*, 400 F. 2d 627, 639 (1968),[3] have held that in some circumstances such an inquiry is required. The Court of Appeals for the Eleventh Circuit has held that it is

---

[3] In *Silverthorne*, the Court of Appeals for the Ninth Circuit held that jurors should be interrogated as to the contents of the news reports which they had read. But in the later case of *United States* v. *Polizzi*, 500 F. 2d 856 (1974), cert. denied *sub nom. Emprise Corp.* v. *United States*, 419 U. S. 1120 (1975), that court held that the pretrial publicity in that case had not been substantial enough to require extended interrogation. It pointed out that in *Silverthorne*, there had been over 300 articles about the defendant, there had been radio and television coverage, and he had testified before the Senate Committee on Government Operations; out of a panel of 65 potential jurors, all had been exposed to some publicity, and 19 had been excused because they had formed an opinion. And in *United States* v. *Giese*, 597 F. 2d 1170 (CA9), cert. denied, 444 U. S. 979 (1979), that court again distinguished *Silverthorne*, commenting that a trial court's own observation must be its guide to the effect of pretrial publicity.

not. *United States* v. *Montgomery*, 772 F. 2d 733, 735–736 (1985). The Courts of Appeals for the Eighth and District of Columbia Circuits appear to take an intermediate position. *United States* v. *Poludniak*, 657 F. 2d 948, 956 (CA8 1981), cert. denied *sub nom. Weigand* v. *United States*, 455 U. S. 940 (1982); *United States* v. *Haldeman*, 181 U. S. App. D. C. 254, 288–289, 559 F. 2d 31, 65–66 (1976), cert. denied *sub nom. Ehrlichman* v. *United States*, 431 U. S. 933 (1977). Even those Federal Courts of Appeals that have required such an inquiry to be made have not expressly placed their decision on constitutional grounds.

As noted above, our own cases have stressed the wide discretion granted to the trial court in conducting *voir dire* in the area of pretrial publicity and in other areas of inquiry that might tend to show juror bias. Particularly with respect to pretrial publicity, we think this primary reliance on the judgment of the trial court makes good sense. The judge of that court sits in the locale where the publicity is said to have had its effect and brings to his evaluation of any such claim his own perception of the depth and extent of news stories that might influence a juror. The trial court, of course, does not impute his own perceptions to the jurors who are being examined, but these perceptions should be of assistance to it in deciding how detailed an inquiry to make of the members of the jury venire.

Petitioner relies heavily on our opinion in *Irvin* v. *Dowd*, 366 U. S. 717 (1961), to support his position. In that case, we held that pretrial publicity in connection with a capital trial had so tainted the jury pool in Gibson County, Indiana, that the defendant was entitled as a matter of federal constitutional law to a change of venue to another county. Our opinion in that case details at great length the extraordinary publicity that attended the defendant's prosecution and conviction for murder.

> "[A] barrage of newspaper headlines, articles, cartoons and pictures was unleashed against [the defendant] dur-

ing the six or seven months preceding his trial. . . . [T]he newspapers in which the stories appeared were delivered regularly to approximately 95% of the dwellings in Gibson County and . . . the Evansville radio and TV stations, which likewise blanketed that county, also carried extensive newscasts covering the same incidents." *Id.*, at 725.

Two-thirds of the jurors actually seated had formed an opinion that the defendant was guilty, and acknowledged familiarity with material facts and circumstances of the case. *Id.*, at 728. Although each of these jurors said that he could be impartial, we concluded:

"With his life at stake, it is not requiring too much that petitioner be tried in an atmosphere undisturbed by so huge a wave of public passion and by a jury other than one in which two-thirds of the members admit, before hearing any testimony, to possessing a belief in his guilt." *Ibid.*

We believe that this case is instructive, but not in the way petitioner employs it. It did not deal with any constitutional requirement of *voir dire* inquiry, and it is not clear from our opinion how extensive an inquiry the trial court made. But the contrast between that case and the present one is marked. In *Irvin*, the trial court excused over half of a panel of 430 persons because their opinions of the defendant's guilt were so fixed that they could not be impartial, and 8 of the 12 jurors who sat had formed an opinion as to guilt. In the present case, 8 of the 12 jurors who sat answered that they had read or heard something about the case, but none of those 8 indicated that he had formed an opinion as to guilt, or that the information would affect his ability to judge petitioner solely on the basis of the evidence presented at trial.

A trial court's findings of juror impartiality may "be overturned only for 'manifest error.'" *Patton* v. *Yount*, 467 U. S. 1025, 1031 (1984) (quoting *Irvin* v. *Dowd, supra,* at

723). In *Patton*, we acknowledged that "adverse pretrial publicity can create such a presumption of prejudice in a community that the jurors' claims that they can be impartial should not be believed," 467 U. S., at 1031, but this is not such a case. Had the trial court in this case been confronted with the "wave of public passion" engendered by pretrial publicity that occurred in connection with Irvin's trial, the Due Process Clause of the Fourteenth Amendment might well have required more extensive examination of potential jurors than it undertook here. But the showings are not comparable; the cases differ both in the kind of community in which the coverage took place and in extent of media coverage. Unlike the community involved in *Irvin*, the county in which petitioner was tried, Prince William, had a population in 1988 of 182,537, and this was one of nine murders committed in the county that year. It is a part of the metropolitan Washington statistical area, which has a population of over 3 million, and in which, unfortunately, hundreds of murders are committed each year. In *Irvin*, news accounts included details of the defendant's confessions to 24 burglaries and six murders, including the one for which he was tried, as well as his unaccepted offer to plead guilty in order to avoid the death sentence. They contained numerous opinions as to his guilt, as well as opinions about the appropriate punishment. While news reports about Mu'Min were not favorable, they did not contain the same sort of damaging information. Much of the pretrial publicity was aimed at the Department of Corrections and the criminal justice system in general, criticizing the furlough and work-release programs that made this and other crimes possible. Any killing that ultimately results in a charge of capital murder will engender considerable media coverage, and this one may have engendered more than most because of its occurrence during the 1988 Presidential campaign, when a similar crime committed by a Massachusetts inmate became a subject of national debate. But, while the pretrial publicity in this case appears to have

been substantial, it was not of the same kind or extent as that found to exist in *Irvin.*

Petitioner also relies on the Standards for Criminal Justice 8–3.5 (2d ed. 1980) promulgated by the American Bar Association. These Standards require interrogation of each juror individually with respect to "what the prospective juror has read and heard about the case," "[i]f there is a substantial possibility that individual jurors will be ineligible to serve because of exposure to potentially prejudicial material." These Standards, of course, leave to the trial court the initial determination of whether there is such a substantial possibility. But, more importantly, the Standards relating to *voir dire* are based on a substantive rule that renders a potential juror subject to challenge for cause, without regard to his state of mind, if he has been exposed to and remembers "highly significant information" or "other incriminating matters that may be inadmissible in evidence." That is a stricter standard of juror eligibility than that which we have held the Constitution to require. Under the ABA Standard, answers to questions about content, without more, could disqualify the juror from sitting. Under the constitutional standard, on the other hand, "[t]he relevant question is not whether the community remembered the case, but whether the jurors . . . had such fixed opinions that they could not judge impartially the guilt of the defendant." *Patton, supra,* at 1035. Under this constitutional standard, answers to questions about content alone, which reveal that a juror remembered facts about the case, would not be sufficient to disqualify a juror. "It is not required . . . that the jurors be totally ignorant of the facts and issues involved." *Irvin,* 366 U. S., at 722.

The ABA Standards, as indicated in our previous discussion of state and federal court decisions, have not commended themselves to a majority of the courts that have considered the question. The fact that a particular rule may be thought to be the "better" view does not mean that it is incorporated

into the Fourteenth Amendment. *Cupp* v. *Naughten*, 414 U. S. 141 (1973).

The *voir dire* examination conducted by the trial court in this case was by no means perfunctory. The court asked the entire venire of jurors four separate questions about the effect on them of pretrial publicity or information about the case obtained by other means. One juror admitted to having formed a belief as to petitioner's guilt and was excused for cause. The trial court then conducted further *voir dire* in panels of four, and each time an individual juror indicated that he had acquired knowledge about the case from outside sources, he was asked whether he had formed an opinion; none of the jurors seated indicated that he had formed an opinion. One juror who equivocated as to her impartiality was excused by the trial court on its own motion. Several other jurors were excused for other reasons. It is quite possible that if *voir dire* interrogation had revealed one or more jurors who had formed an opinion about the case, the trial court might have decided to question succeeding jurors more extensively.

*Voir dire* examination serves the dual purposes of enabling the court to select an impartial jury and assisting counsel in exercising peremptory challenges. In *Aldridge* and *Ham* we held that the subject of possible racial bias must be "covered" by the questioning of the trial court in the course of its examination of potential jurors, but we were careful not to specify the particulars by which this could be done. We did not, for instance, require questioning of individual jurors about facts or experiences that might have led to racial bias. Petitioner in this case insists, as a matter of constitutional right, not only that the subject of possible bias from pretrial publicity be covered—which it was—but that questions specifically dealing with the content of what each juror has read be asked. For the reasons previously stated, we hold that the Due Process Clause of the Fourteenth Amendment does not reach this far, and that the *voir dire* examination conducted

by the trial court in this case was consistent with that provision. The judgment of the Supreme Court of Virginia is accordingly

*Affirmed.*

JUSTICE O'CONNOR, concurring.

No one doubts that Dawud Majid Mu'Min's brutal murder of Gladys Nopwasky attracted extensive media coverage. For days on end, the case made headlines because it involved a macabre act of senseless violence and because it added fuel to an already heated political controversy about the wisdom of inmate work-release programs. But the question we decide today is not whether the jurors who ultimately convicted Mu'Min had previously read or heard anything about the case; everyone agrees that eight of them had. Nor is the question whether jurors who read that Mu'Min had confessed to the murder should have been disqualified as a matter of law. See *post*, at 441–442, 444. This claim is squarely foreclosed by *Patton* v. *Yount*, 467 U. S. 1025 (1984), where we upheld a trial court's decision to seat jurors who had read about the case notwithstanding that the defendant's written confessions, which were not admissible at trial, were widely reported in the press. See *id.*, at 1029; *id.*, at 1047 (STEVENS, J., dissenting). The only question before us is whether the trial court erred by crediting the assurances of eight jurors that they could put aside what they had read or heard and render a fair verdict based on the evidence.

JUSTICE MARSHALL insists that the trial judge could not have assessed realistically the jurors' credibility without first identifying the information to which each individual juror had been exposed. I disagree. It is true that the trial judge did not know precisely what each individual juror had read about the case. He was undeniably aware, however, of the full range of information that had been reported. This is because Mu'Min submitted to the court, in support of a motion for a change of venue, 47 newspaper articles relating to the murder. *Ante*, at 418. The trial judge was thus aware, long

before *voir dire*, of all of the allegedly prejudicial information to which prospective jurors might have been exposed.

With this information in mind, the trial judge had to determine whether or not to believe the jurors' assurances that they would be able to enter the jury box with an open mind. To this end, he questioned prospective jurors repeatedly about whether exposure to pretrial publicity had impaired their ability to be impartial. One juror who equivocated was excused by the trial court on its own motion. *Ante*, at 421. As to the jurors ultimately selected, the trial judge determined that their assurances of impartiality were credible. As we observed in *Patton* v. *Yount*, credibility determinations of this kind are entitled to '"special deference,"' 467 U. S., at 1038, and will be reversed only for '"manifest error."' *Id.*, at 1031–1032.

The dissent is correct to point out that the trial judge could have done more. He could have decided, in his discretion, to ask each juror to recount what he or she remembered reading about the case. The fact remains, however, that the trial judge himself was familiar with the potentially prejudicial publicity to which the jurors might have been exposed. Hearing individual jurors repeat what the judge already knew might still have been helpful: A particular juror's tone of voice or demeanor might have suggested to the trial judge that the juror had formed an opinion about the case and should therefore be excused. I cannot conclude, however, that "content" questions are so indispensable that it violates the Sixth Amendment for a trial court to evaluate a juror's credibility instead by reference to the full range of potentially prejudicial information that has been reported. Accordingly, I join the Court's opinion.

JUSTICE MARSHALL, with whom JUSTICE BLACKMUN and JUSTICE STEVENS join as to all but Part IV, dissenting.

Today's decision turns a critical constitutional guarantee — the Sixth Amendment's right to an impartial jury — into a hollow formality. Petitioner Dawud Majid Mu'Min's capital

murder trial was preceded by exceptionally prejudicial publicity, and at jury selection 8 of the 12 jurors who ultimately convicted Mu'Min of murder and sentenced him to death admitted exposure to this publicity. Nonetheless, the majority concludes that the trial court was under no obligation to ask what these individuals knew about the case before seating them on the jury. Instead, the majority holds that the trial court discharged its obligation to ensure the jurors' impartiality by merely asking the jurors whether *they* thought they could be fair.

The majority's reasoning is unacceptable. When a prospective juror has been exposed to prejudicial pretrial publicity, a trial court cannot realistically assess the juror's impartiality without first establishing what the juror already has learned about the case. The procedures employed in this case were wholly insufficient to eliminate the risk that two-thirds of Mu'Min's jury entered the jury box predisposed against him. I dissent.

## I

The majority concedes that the charges against Mu'Min "engendered substantial publicity," *ante,* at 417, and that "news reports about Mu'Min were not favorable," *ante,* at 429, but seeks to minimize the impact of the pretrial publicity by arguing that it was not as extensive as in other cases that have come before this Court, *ibid.* The majority's observation is completely beside the point. Regardless of how widely disseminated news of the charges against Mu'Min might have been, the simple fact of the matter is that *two-thirds* of the persons on Mu'Min's jury admitted having read or heard about the case. While the majority carefully avoids any discussion of the specific nature of the pretrial publicity, it is impossible to assess fairly Mu'Min's claim without first examining precisely what was written about the case prior to trial.

On September 22, 1988, Gladys Nopwasky was stabbed to death in the retail carpet and flooring store she owned in Dale

City, Virginia. Several weeks later, Mu'Min, an inmate serving a 48-year sentence for first-degree murder, was indicted for murdering Nopwasky. Facts developed at trial established that Mu'Min had committed the murder after escaping from the site of a Virginia Department of Transportation work detail. See 239 Va. 433, 437–438, 389 S. E. 2d 886, 889–890 (1990).

The circumstances of the murder generated intense local interest and political controversy. The press focused on the gross negligence of the corrections officials responsible for overseeing the work detail from which Mu'Min had escaped. It was reported, for instance, that the facility to which Mu'Min was assigned had been enclosed by only a four-foot high fence, with a single strand of barbed wire across the top. See App. in No. 890899 (Va. Sup. Ct.), p. 963 (hereinafter App.). It was also reported that the lax supervision at the facility allowed the inmates to have ready access to alcohol, drugs, and weapons and to slip away from the work detail for extended periods without detection. Id., at 922, 939, 963–964. Shortly after the charges against Mu'Min became public, the state official in charge of administering both corrections and highway programs issued a public apology. Id., at 927. Not satisfied, a number of area residents wrote editorials demanding that all state officials responsible for the inmate work-release program be fired, id., at 930, 931, 937, 974, and area leaders pushed for increased controls on inmate-release programs, see id., at 933, 935, 936, 958. Officials responded with the introduction of stiffer restrictions on prison work crews, id., at 922, 938, and with the suspension of furloughs for inmates convicted of violent crimes, id., at 970. In explaining the new policies, the director of Virginia's Department of Corrections acknowledged that the explosive public reaction to the charges against Mu'Min had been intensified by the case of Willie Horton, whose rape and assault of a Maryland woman while on furlough became a major

issue in the 1988 presidential campaign. "'The world's in an uproar right now,'" the official was quoted as stating. *Ibid.*

Naturally, a great deal of the media coverage of this controversy was devoted to Mu'Min and the details of his crime. Most of the stories were carried on the front pages of local papers, and almost all of them were extremely prejudicial to Mu'Min. Readers of local papers learned that Nopwasky had been discovered in a pool of blood, with her clothes pulled off and semen on her body. *Id.*, at 925. In what was described as a particularly "macabre" side of the story, a local paper reported that, after raping and murdering Nopwasky, Mu'Min returned to the work site to share lunch with other members of the prison detail. *Id.*, at 963.

Readers also learned that Mu'Min had confessed to the crime. Under the banner headlines, "Murderer confesses to killing woman," *id.*, at 975–976, and "Inmate Said to Admit to Killing," *id.*, at 925, the press accompanied the news of Mu'Min's indictment with the proud announcement of Virginia's Secretary of Transportation and Public Safety that the State had already secured Mu'Min's acknowledgment of responsibility for the murder. See *id.*, at 975, 981. Subsequent stories reported that, upon being confronted with the charges, Mu'Min initially offered the incredible claim that he had entered the store only to help Nopwasky after witnessing another man attempting to rape her. *Id.*, at 932, 945. However, according to these reports, Mu'Min eventually abandoned this story and confessed to having stabbed Nopwasky twice with a steel spike, once in the neck and once in the chest, after having gotten into a dispute with her over the price of Oriental rugs. *Id.*, at 945, 955. One of these stories was carried under the front-page headline: "Accused killer says he stabbed Dale City woman after argument." *Id.*, at 945.

Another story reported that Mu'Min had admitted at least having contemplated raping Nopwasky. According to this article, Mu'Min had told authorites, "'The thought did cross

my mind, but I did not have sex with her.'" *Id.*, at 959. This item was reported as a front-page story, captioned by the headline: "Mu'Min Says He Decided against Raping Nopwasky." *Ibid.* See also *id.*, at 922 (headline reading "Laxity was factor in sex killing").

Those who read the detailed reporting of Mu'Min's background would have come away with little doubt that Mu'Min was fully capable of committing the brutal murder of which he was accused. One front-page story set forth the details of Mu'Min's 1973 murder of a cab driver. See *id.*, at 951. Another, entitled "Accused killer had history of prison trouble," stated that between 1973 and 1988, Mu'Min had been cited for 23 violations of prison rules and had been denied parole six times. *Id.*, at 942. It was also reported that Mu'Min was a suspect in a recent prison beating. *Id.*, at 921. Several stories reported that Mu'Min had strayed from the Dale City work detail to go on numerous criminal forays before murdering Nopwasky, sometimes stealing beer and wine, *id.*, at 932, 956, 959, and on another occasion breaking into a private home, *id.*, at 964. As quoted in a local paper, a Department of Corrections report acknowledged that Mu'Min "'could not be described as a model prisoner.'" *Id.*, at 939, 969. Contacted by a reporter, one of Mu'Min's fellow inmates described Mu'Min as a "'lustful'" individual who did "'strange stuff.'" "'Maybe not this,'" the inmate was quoted as saying, "'but I knew something was going to happen.'" *Id.*, at 964.

Indeed, readers learned that the murder of Nopwasky could have been avoided if the State had been permitted to seek the death penalty in Mu'Min's 1973 murder case. In a story headlined "Mu'Min avoided death for 1973 murder in Va.," one paper reported that but for this Court's decision a year earlier in *Furman* v. *Georgia*, 408 U. S. 238 (1972), which temporarily invalidated the death penalty, the prosecutor at the earlier trial "would have had a case of capital murder." App., at 951. As reported in the press, the pros-

ecutor who indicted Mu'Min for murdering Nopwasky concurred that the case underscored the need for "'more and swifter capital punishment.'" *Id.*, at 980.

Finally, area residents following the controversy were told in no uncertain terms that their local officials were already convinced of Mu'Min's guilt. The local Congressman announced that he was "deeply distressed by news that my constituent Gladys Nopwasky was murdered by a convicted murderer serving in a highway department work program" and demanded an explanation of the "decisions that allowed a person like Dawad Mu'min to commit murder." *Id.*, at 981. His opponent in the 1988 congressional election, a member of the Virginia House of Delegates, likewise wrote an editorial in which he stated, "I am outraged that a Department of Corrections inmate apparently murdered a resident of Dale City." *Id.*, at 984. Assuring the public that the right person had been charged with the crime, the local police chief explained, "'We haven't lost very many [murder cases] lately. . . . All of the evidence will come out at some point.'" *Id.*, at 979. Indeed, by virtue of the intense media coverage, that "point" was reached long before trial.

## II

The question before us is whether, in light of the charged atmosphere that surrounded this case, the trial court was constitutionally obliged to ask the eight jurors who admitted exposure to pretrial publicity to identify precisely *what* they had read, seen, or heard. The majority answers this question in the negative. According to the majority, the trial court need ask no more of a prospective juror who has admitted exposure to pretrial publicity than whether that prospective juror views himself as impartial. Our cases on juror-bias, the majority asserts, have never gone so far as to require trial courts to engage in so-called "content questioning," and to impose such a requirement would prove unduly

burdensome to the administration of justice. I cannot accept this analysis.

This Court has long and repeatedly recognized that exposure to pretrial publicity may undermine a defendant's Sixth Amendment guarantee to trial by an impartial jury. *E. g.*, *Irvin* v. *Dowd*, 366 U. S. 717 (1961); *Rideau* v. *Louisiana*, 373 U. S. 723 (1963); *Sheppard* v. *Maxwell*, 384 U. S. 333 (1966); *Murphy* v. *Florida*, 421 U. S. 794 (1975); *Patton* v. *Yount*, 467 U. S. 1025 (1984).[1] In order for the jury to fulfill its constitutional role, each juror must set aside any preconceptions about the case and base his verdict solely on the evidence at trial. *Irvin* v. *Dowd, supra*, at 722. "The theory of our system is that the conclusions to be reached in a case will be induced only by evidence and argument in open court, and not be any outside influence, whether of private talk or public print." *Patterson* v. *Colorado ex rel. Attorney General*, 205 U. S. 454, 462 (1907).

Nonetheless, before today, this Court had *not* been called upon to address in any great detail the *procedures* necessary to assure the protection of the right to an impartial jury under the Sixth Amendment. In particular, although our cases indicate that the trial court's conclusion that a particular juror has not been overwhelmed by pretrial publicity is reviewable only for "'manifest error,'" *Patton* v. *Yount, supra*, at 1031, quoting *Irvin* v. *Dowd, supra*, at 723, we have never indicated the type of *voir dire* that the trial court must undertake in order for its findings to merit this "'special deference,'" *Patton* v. *Yount, supra*, at 1038, quoting *Bose Corp.* v. *Consumers Union of U. S., Inc.*, 466 U. S. 485, 500 (1984). Because the issue in today's case is essentially one of first impression, the majority's observation that our racial-bias cases have never gone so far as to require content questioning, see *ante*, at 431, is irrelevant. Even assuming that

---

[1] The Due Process Clause likewise guarantees a criminal defendant's right to an impartial jury. See *Ristaino* v. *Ross*, 424 U. S. 589, 595, n. 6 (1976).

the scope of *voir dire* in the pretrial-publicity setting need be no greater than the scope of *voir dire* in the racial-bias setting, no inference can be drawn from the failure of decisions like *Ham* v. *South Carolina,* 409 U. S. 524 (1973), and *Aldridge* v. *United States,* 283 U. S. 308 (1931), to "require questioning of individual jurors about facts or experiences that might have led to racial bias," *ante,* at 431, because the sole issue in those cases was whether *any* inquiry into racial bias was required.

Indeed, the only firm conclusion that can be drawn from our impartial-jury jurisprudence is that a prospective juror's *own* "assurances that he is equal to this task cannot be dispositive of the accused's rights." *Murphy* v. *Florida, supra,* at 800. As JUSTICE O'CONNOR has observed, an individual "juror may have an interest in concealing his own bias . . . [or] may be unaware of it." *Smith* v. *Phillips,* 455 U. S. 209, 221–222 (1982) (concurring opinion). "Natural human pride would suggest a negative answer to whether there was a reason the juror could not be fair and impartial." *United States* v. *Dellinger,* 472 F. 2d 340, 375 (CA7 1972); compare *Irvin* v. *Dowd, supra,* at 728 ("No doubt each juror was sincere when he said that he would be fair and impartial to petitioner, but the psychological impact requiring such a declaration before one's fellows is often its father"). It is simply impossible to square today's decision with the established principle that, where a prospective juror admits exposure to pretrial publicity, the trial court must do more than elicit a simple profession of open-mindedness before swearing that person into the jury.

To the extent that this Court has considered the matter, it has emphasized that where a case has been attended by adverse pretrial publicity, the trial court should undertake "*searching* questioning of potential jurors . . . to screen out those with fixed opinions as to guilt or innocence." *Nebraska Press Assn.* v. *Stuart,* 427 U. S. 539, 564 (1976) (emphasis added); accord, *id.,* at 602 (Brennan, J., concurring

in judgment). Anything less than this renders the defendant's right to an impartial jury meaningless. See *Ham* v. *South Carolina, supra,* at 532 (MARSHALL, J., concurring in part and dissenting in part). As this Court has recognized, "[p]reservation of the opportunity to prove actual bias is a guarantee of a defendant's right to an impartial jury." *Dennis* v. *United States,* 339 U. S. 162, 171–172 (1950). The fact that the defendant bears the burden of establishing juror partiality, see, *e. g., Wainwright* v. *Witt,* 469 U. S. 412, 423 (1985); *Irvin* v. *Dowd, supra,* at 723, makes it all the more imperative that the defendant be entitled to meaningful examination at jury selection in order to elicit potential biases possessed by prospective jurors.

In my view, once a prospective juror admits exposure to pretrial publicity, content questioning must be part of the *voir dire* for at least three reasons. First, content questioning is necessary to determine whether the type and extent of the publicity to which a prospective juror has been exposed would disqualify the juror as a matter of law. Our cases recognize that, under certain circumstances, exposure to particularly inflammatory publicity creates so strong a presumption of prejudice that "the jurors' claims that they can be impartial should not be believed." *Patton* v. *Yount, supra,* at 1031; see *Murphy* v. *Florida,* 421 U. S., at 798–799. For instance, in *Irvin* v. *Dowd, supra,* we concluded that a capital defendant was constitutionally entitled to a change of venue because *no one* who had been exposed to the inflammatory media descriptions of his crime and confession could possibly have fairly judged his case, and because this publicity had saturated the community in which the defendant was on trial. See *id.,* at 725–729. Similarly, in *Rideau* v. *Louisiana,* 373 U. S. 723 (1963), we presumed community prejudice mandating a change in venue when petitioner's filmed confession obtained during a police interrogation was broadcast on local television over three consecutive days. See *id.,* at 724, 726–727. An individual exposed to publicity qualitatively

akin to the publicity at issue in *Irvin* and *Rideau* is necessarily disqualified from jury service no matter how earnestly he professes his impartiality.[2]   But unless the trial court asks a prospective juror exactly *what* he has read or heard about a case, the court will not be able to determine whether the juror comes within this class.   Cf. *Murphy* v. *Florida, supra,* at 800–802 (performing careful analysis of content of pretrial publicity to which jurors had been exposed before rejecting impartiality challenge); *Sheppard* v. *Maxwell,* 384 U. S., at 357 (observing that jurors had been exposed to prejudicial publicity during trial and criticizing trial court's failure to ask the jurors "whether they had read or heard specific prejudicial comment about the case").[3]

Second, even when pretrial publicity is not so extreme as to make a juror's exposure to it *per se* disqualifying, content questioning still is essential to give legal depth to the trial court's finding of impartiality.   One of the reasons that a "juror may be unaware of" his own bias, *Smith* v. *Phillips,*

---

[2] This Court has recognized that other types of extra-judicial influences also will automatically require a juror's disqualification.   See *Turner* v. *Louisiana,* 379 U. S. 466 (1965) (jurors placed in custody of deputy sheriffs who were key prosecution witnesses presumed incapable of rendering impartial verdict); *Leonard* v. *United States,* 378 U. S. 544 (1964) *(per curiam)* (prospective jurors who heard trial court announce defendant's guilty verdict in first trial presumed incapable of rendering impartial verdict on second trial on similar charges).

[3] The majority suggests that content questions will be necessary only when a community has been saturated by a " 'wave of public passion,' " as in *Irvin.*   See *ante,* at 429.   The majority's argument misses the point of *Irvin.*   That case stands for the proposition that when a community has been subject to unrelenting prejudicial pretrial publicity the *entire community* will be presumed both exposed to the publicity and prejudiced by it, entitling the defendant to a change of venue.   See *Irvin* v. *Dowd,* 366 U. S. 717, 727–728 (1961).   In this case, however, Mu'Min does not argue that the pretrial publicity was extensive enough to create a presumption of *community* prejudice.   Rather, he argues that the publicity was prejudicial enough to create a presumption of prejudice on the part of any *individual* juror who actually read it.

455 U. S., at 222 (O'CONNOR, J., concurring), is that the issue of impartiality is a mixed question of law and fact, see *Irvin* v. *Dowd*, 366 U. S., at 723, the resolution of which necessarily draws upon the *trial court's* legal expertise. Where, as in this case, a trial court asks a prospective juror merely whether he can be "impartial," the court may well get an answer that is the product of the juror's own confusion as to what impartiality is.[4] By asking the prospective juror in addition to identify what he has read or heard about the case and what corresponding impressions he has formed, the trial court is able to confirm that the impartiality that the juror professes is the same impartiality that the Sixth Amendment demands.

Third, content questioning facilitates accurate trial court factfinding. As this Court has recognized, the impartiality "determination is essentially one of credibility." *Patton* v. *Yount*, 467 U. S., at 1038. Where a prospective juror acknowledges exposure to pretrial publicity, the precise content of that publicity constitutes contextual information essential to an accurate assessment of whether the prospective

---

[4] The questioning of one prospective juror during the murder and bank robbery trial of Susan Saxe provides a particularly dramatic example of this phenomenon. When initially queried, the juror admitted to having read about the case but insisted that she was impartial. The following colloquy then ensued:

"Q: When you said that you have only read about what [the defendant] has done, what do you mean by that?

"A: Well, we all know what she has done. You know, we all know what she has done. So it is now up to the court to see if she is guilty or innocent, but you have to go through the whole trial, you can't just read something in the paper and say that girl is guilty, you know. You understand?

"Q: Well, I am not sure. I am not sure what you mean when you say we all know what she has done.

"A: Well, we all know the girl went in and held up the bank and the policeman was shot there."

The juror was subsequently excused. See National Jury Project, Jury-work § 10.03[3], pp. 10–47 to 10–49 (2d ed. 1990).

juror's profession of impartiality is believable.   If the trial court declines to develop this background, its finding of impartiality simply does not merit appellate deference.

In my view, the circumstances of this case presented a clear need for content questioning.   Exactly *two-thirds* of the persons on Mu'Min's jury admitted having been exposed to information about the case before trial.   As I have shown, see *supra*, at 435–438, the stories printed prior to trial were extraordinarily prejudicial, and were made no less so by the inflammatory headlines typically used to introduce them. Much of the pretrial publicity was of the type long thought to be uniquely destructive of a juror's ability to maintain an open mind about a case—in particular, reports of Mu'Min's confession, see *Nebraska Press Assn.* v. *Stuart*, 427 U. S., at 541, 563; *id.*, at 602 (Brennan, J., concurring in judgment); *Rideau* v. *Louisiana, supra, Irvin* v. *Dowd, supra*, at 725– 726; statements by prominent public officials attesting to Mu'Min's guilt, see *Nebraska Press Assn.* v. *Stuart, supra*, at 602 (Brennan, J., concurring in judgment); *Sheppard* v. *Maxwell, supra*, at 340, 349; and reports of Mu'Min's unsavory past, see *Irvin* v. *Dowd, supra*, at 725–726.   Because of the profoundly prejudicial nature of what was published in the newspapers prior to trial, any juror exposed to the bulk of it certainly would have been disqualified as a matter of law under the standards set out in *Irvin* and *Rideau*.   Indeed, the single story headlined "Murderer confesses to killing woman," App. 975–976, or alternatively the story headlined "Accused killer says he stabbed Dale City woman after argument," *id.*, at 945, in my opinion would have had just as destructive an effect upon the impartiality of anyone who read it as did the filmed confession in *Rideau* upon the members of the community in which it was broadcast.   At minimum, without inquiry into what stories had been read by the eight members of the jury who acknowledged exposure to

pretrial publicity, the trial court was in no position to credit their individual professions of impartiality.

According to JUSTICE O'CONNOR, the trial court was not obliged to pose content questions because "the trial judge himself was familiar with the potentially prejudicial publicity to which the jurors might have been exposed." *Ante*, at 433 (concurring opinion). I find this observation perplexing. The judge's awareness of the contents of the extraordinarily prejudicial stories written about Mu'Min is not a substitute for knowledge of whether the *prospective jurors* were aware of the content of these stories. As I have explained, it is the judge's ignorance of the *jurors'* exposure to particular stories that renders his findings of juror impartiality unworthy of appellate deference. Indeed, because at least two of the stories would have rendered any person who read them *per se* unqualified to sit on the jury, the trial judge's awareness of these stories makes even more inexcusable his willingness to seat the jurors without first ascertaining what they had read about the case.[5] Nor is it any answer to protest, as JUSTICE O'CONNOR does, that the trial court "repeatedly" asked the prospective jurors whether they thought they could be fair. *Ibid.* When a prospective juror admits exposure to pretrial publicity, the juror's assertion of impartiality, on its own, is insufficient to establish his impartiality for constitutional purposes. I do not see how the juror's assertion of impartiality becomes any more sufficient merely through repetition.

---

[5] JUSTICE O'CONNOR claims that *Patton* v. *Yount*, 467 U. S. 1025 (1984), "squarely foreclose[s]" any argument that a juror may be disqualified as a matter of law when exposed to prejudicial pretrial publicity. *Ante*, at 432 (concurring opinion). She misreads *Patton*. Far from rejecting this principle, *Patton* expressly recognized the teaching of *Irvin* v. *Dowd*, 366 U. S. 717 (1961), that juror exposure to prejudicial pretrial publicity may create so great a presumption of juror prejudice "that the jurors' claims that they can be impartial should not be believed." 467 U. S., at 1031. The Court in *Patton* merely found that the publicity in that case was not of a character to justify a finding of presumed prejudice. See *id.*, at 1031–1035.

Finally, I reject the majority's claim that content questioning should be rejected because it would unduly burden trial courts. See *ante*, at 425. Sixty years ago, Chief Justice Hughes rejected a similar contention:

"The argument is advanced on behalf of the Government that it would be detrimental to the administration of the law in the courts of the United States to allow questions to jurors as to racial or religious prejudices. We think that it would be far more injurious to permit it to be thought that persons entertaining a disqualifying prejudice were allowed to serve as jurors and that inquiries designed to elicit the fact of disqualification were barred. No surer way could be devised to bring the processes of justice into disrepute." *Aldridge* v. *United States*, 283 U. S., at 314–315.

This reasoning is fully applicable here.

In any case, the majority's solicitude for administrative convenience is wholly gratuitous. Numerous Federal Circuits and States have adopted the sorts of procedures for screening juror bias that the majority disparages as being excessively intrusive. See *United States* v. *Addonizio*, 451 F. 2d 49, 67 (CA3 1971) (content questioning and sequestered *voir dire*), cert. denied, 405 U. S. 936 (1972); *United States* v. *Davis*, 583 F. 2d 190, 196 (CA5 1978) (content questioning); *Silverthorne* v. *United States*, 400 F. 2d 627, 639 (CA9 1968) (content questioning); Minn. Rule Crim. Proc. 26.02, Subd. 4(2)(b) (sequestered *voir dire*); *State* v. *Pokini*, 55 Haw. 640, 643–644, 526 P. 2d 94, 100–101 (1974) (content questioning); *State* v. *Goodson*, 412 So. 2d 1077, 1081 (La. 1982) (content questioning and sequestered *voir dire*); *State* v. *Claybrook*, 736 S. W. 2d 95, 99–100 (Tenn. 1987) (sequestered *voir dire*); *State* v. *Herman*, 93 Wash. 2d 590, 593–594, 611 P. 2d 748, 750 (1980) (sequestered *voir dire*); *State* v. *Finley*, 177 W. Va. 554, 557–558, 355 S. E. 2d 47, 50–51 (1987) (sequestered *voir dire*). See also *United States* v. *Colabella*, 448 F. 2d 1299, 1303 (CA2 1971) (recommending sequestered *voir dire*

in cases involving prejudicial pretrial publicity); *United States* v. *Harris*, 542 F. 2d 1283, 1295 (CA7 1976) (same), cert. denied *sub nom. Clay* v. *United States*, 430 U. S. 934 (1977), American Bar Association Standards for Criminal Justice 8–3.5(a) (2d ed. 1980) (same), Judicial Conference of the United States, Revised Report of the Judicial Conference Committee on the Operation of the Jury System on the "Free Press—Fair Trial" Issue, 87 F. R. D. 519, 532–533 (1980) (same). Additionally, two other States guarantee criminal defendants sequestered *voir dire* as a matter of right in all capital cases. See Ky. Rule Crim. Proc. 9.38; Tex. Code Crim. Proc. Ann., Art. 35.17 (Vernon 1989). In short, the majority's anxiety is difficult to credit in light of the number of jurisdictions that have concluded that meaningful steps can be taken to insulate the proceedings from juror bias without compromising judicial efficiency.[6]

### III

"Given the pervasiveness of modern communications and the difficulty of effacing prejudicial publicity from the minds of the jurors, the trial courts must take strong measures to ensure that the balance is never weighed against the accused." *Sheppard* v. *Maxwell*, 384 U. S., at 362. The reason for this is simple and compelling: In our system of justice, "only the jury may strip a man of his liberty or his life." *Irvin* v. *Dowd*, 366 U. S., at 722.

Eight of the twelve jurors who voted to strip Dawud Majid Mu'Min of his life may well have been rendered incapable of reaching any other verdict after reading of the grisly accusa-

---

[6] Today's opinion addresses only the extent to which the Constitution requires content questioning in cases involving pretrial publicity. As the majority acknowledges, the Federal Circuits that have mandated content questioning in pretrial publicity cases have done so in the exercise of their supervisory powers and not as a matter of constitutional law. See *ante*, at 426–427. Consequently, nothing in today's opinion can be read as overturning the use of content questioning in these Circuits, nor does today's decision prevent other Federal Circuits from following suit.

tions against Mu'Min and the succession of stories indicating that he was guilty. The majority holds that the trial court was entitled to seat those jurors — entirely blind to what they in fact already knew about the case — based solely upon their assertions of impartiality. Far from "tak[ing] strong measures to ensure that the balance [was not] weighed against the accused," the procedures undertaken in this case amounted to no more than the trial court going through the motions. I cannot accept that a defendant's Sixth Amendment right to an impartial jury means so little. I dissent.

## IV

Even if I were to believe that the procedures employed at Mu'Min's jury selection satisfied the requirements of the Sixth Amendment, I still would vacate his death sentence. I adhere to my view that the death penalty is in all circumstances cruel and unusual punishment prohibited by the Eighth and Fourteenth Amendments. *Gregg* v. *Georgia*, 428 U. S. 153, 231 (1976) (MARSHALL, J., dissenting).

JUSTICE KENNEDY, dissenting.

Our precedents mark the distinction between allegations that the individual jurors might have been biased from exposure to pretrial publicity, see *Patton* v. *Yount*, 467 U. S. 1025, 1036–1040 (1984); *Murphy* v. *Florida*, 421 U. S. 794, 799–803 (1975), and the quite separate problem of a case tried in an atmosphere so corruptive of the trial process that we will presume a fair trial could not be held, nor an impartial jury assembled, see *Patton* v. *Yount*, *supra*, at 1031–1035; *Murphy* v. *Florida*, *supra*, at 797–799. Some of the principal cases cited in our opinions today, for instance, *Sheppard* v. *Maxwell*, 384 U. S. 333 (1966), *Rideau* v. *Louisiana*, 373 U. S. 723 (1963), and probably *Irvin* v. *Dowd*, 366 U. S. 717 (1961), come within the latter classification. In these cases, the trial court or the prosecutor may have been remiss in failing to protect the defendant from a carnival atmosphere created by press coverage. See, *e. g.*, *Sheppard* v. *Maxwell*,

*supra; Estes* v. *Texas,* 381 U. S. 532 (1965). Reviewing decisions in this category, we indicated that "[t]he proceedings in these cases were entirely lacking in the solemnity and sobriety to which a defendant is entitled in a system that subscribes to any notion of fairness and rejects the verdict of a mob." *Murphy* v. *Florida, supra,* at 799. We have described *Irvin*'s holding as being that "adverse pretrial publicity can create such a presumption of prejudice in a community that the jurors' claims that they can be impartial should not be believed." *Patton* v. *Yount, supra,* at 1031.

I am confident this case does not fall in this latter category, and the majority demonstrates the differences between the case before us and cases like *Irvin.* Our inquiry, in my view, should be directed to the question of the actual impartiality of the seated jurors, and the related question whether the trial judge conducted an adequate examination of those eight jurors who acknowledged some exposure to press accounts of the trial.

In deciding whether to seat an individual juror, the issue is whether "the juror can lay aside" any opinion formed as a result of pretrial publicity "and render a verdict based on the evidence presented in court." *Irvin* v. *Dowd, supra,* at 723.

> "It is not required . . . that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case." 366 U. S., at 722.

The question is "one of historical fact: did a juror swear that he could set aside any opinion he might hold and decide the case on the evidence, and should the juror's protestation of impartiality have been believed." *Patton* v. *Yount, supra,* at 1036.

With all respect, I submit that JUSTICE MARSHALL's dissent misreads our precedents by failing to note the distinction between the two quite different questions we have addressed. He appears to conflate the two categories of cases when he suggests that "[a]n individual exposed to publicity qualitatively akin to the publicity at issue in *Irvin* and *Rideau* is necessarily disqualified from jury service no matter how earnestly he professes his impartiality." *Ante,* at 441–442. As JUSTICE MARSHALL wrote on an earlier occasion, cases like *Irvin* and *Rideau* "cannot be made to stand for the proposition that juror exposure to information about a state defendant's prior convictions or to news accounts of the crime with which he is charged alone presumptively deprives the defendant of due process." *Murphy* v. *Florida, supra,* at 799. In an age when a national press has the capacity to saturate the news with information about any given trial, I am dubious of a proposed rule that a juror must be disqualified *per se* because of exposure to a certain level of publicity, without the added pressure of a "huge . . . wave of public passion," *Irvin* v. *Dowd, supra,* at 728. If that rule were adopted, suspects in many celebrated cases might be able to claim virtual immunity from trial.

Unlike the majority, however, and in alignment with some of the concerns expressed by JUSTICE MARSHALL and my colleagues in dissent, I find the *voir dire* in this case was inadequate for an informed ruling that the jurors were qualified to sit. In my view, a juror's acknowledgment of exposure to pretrial publicity initiates a duty to assess that individual juror's ability to be impartial. In *Patton* v. *Yount, supra,* we determined that in federal habeas review, the statutory presumption of correctness of 28 U. S. C. § 2254(d) should attach to a state court's determination that a particular juror could be impartial. We found "good reasons to apply the statutory presumption of correctness to the trial court's resolution of these questions" because "the determination has been made only after an extended *voir dire* proceeding designed specif-

ically to identify biased veniremen" and because "the determination is essentially one of credibility, and therefore largely one of demeanor." 467 U. S., at 1038. Our willingness to accord substantial deference to a trial court's finding of juror impartiality rests on our expectation that the trial court will conduct a sufficient *voir dire* to determine the credibility of a juror professing to be impartial.

There is no single way to *voir dire* a juror, and I would not limit the trial judge's wide discretion to determine the appropriate form and content of *voir dire* questioning. Little interaction may be required to make an individual determination that a juror has the willingness and the ability to set aside any preconceived ideas about the evidence in the case or the guilt or innocence of the defendant. A trial judge might choose to ask about the content of the publicity the juror has encountered, and this knowledge could help in deciding whether the juror's claim of impartiality should be accepted. But the judge can also evaluate impartiality by explaining the trial processes and asking general questions about the juror's commitment to follow the law and the trial court's instructions. For instance, the questions which the trial judge asked in this case would suffice if he had asked them of individual jurors and received meaningful responses. The Court is correct that asking content questions in front of the other jurors may do more harm than good. Further, I agree with JUSTICE O'CONNOR that any need for content questioning disappears if the trial judge evaluating juror impartiality assumes a worst-case hypothesis that the jurors have read or seen all of the pretrial publicity.

My difficulty with the *voir dire* in this case was expressed by the dissenting justices of the Virginia Supreme Court:

> "[T]he questions in this case were deficient in that the prospective jurors could simply remain silent as an implied indication of a lack of bias or prejudice. This gave the trial court no effective opportunity to assess the demeanor of each prospective juror in disclaiming bias."

239 Va. 433, 457, 389 S. E. 2d 886, 901 (1990) (Whiting, J., dissenting).

I fail to see how the trial court could evaluate the credibility of the individuals seated on this jury. The questions were asked of groups, and individual jurors attested to their own impartiality by saying nothing. I would hold, as a consequence, that when a juror admits exposure to pretrial publicity about a case, the court must conduct a sufficient colloquy with the individual juror to make an assessment of the juror's ability to be impartial. The trial judge should have substantial discretion in conducting the *voir dire*, but, in my judgment, findings of impartiality must be based on something more than the mere silence of the individual in response to questions asked en masse.

I submit my respectful dissent.