**UNPUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
            *Plaintiff-Appellee,*

v.

THOMAS W. LEWIS, a/k/a Big Tom,
a/k/a Sluggo,
            *Defendant-Appellant.*

No. 00-4313

Appeal from the United States District Court
for the Eastern District of Virginia, at Richmond.
Richard L. Williams, Senior District Judge.
(CR-93-139)

Argued: April 6, 2001

Decided: July 12, 2001

Before WILKINSON, Chief Judge, and NIEMEYER and
MICHAEL, Circuit Judges.

Affirmed by unpublished per curiam opinion.

**COUNSEL**

**ARGUED:** Anthony George Spencer, MORCHOWER, LUXTON &
WHALEY, Richmond, Virginia, for Appellant. Stephen Wiley Miller,
Assistant United States Attorney, Richmond, Virginia, for Appellee.
**ON BRIEF:** C. David Whaley, MORCHOWER, LUXTON & WHA-
LEY, Richmond, Virginia, for Appellant. Helen F. Fahey, United
States Attorney, M. Hannah Lauck, Assistant United States Attorney,
Richmond, Virginia, for Appellee.

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

## OPINION

PER CURIAM:

Thomas Lewis appeals from his conviction and sentence for operating a continuing criminal enterprise, conspiracy to launder money, money laundering, and structuring a currency transaction to evade the reporting requirements. Lewis argues that the government failed to prove that he operated a continuing criminal enterprise. He also claims that his conviction for operating a continuing criminal enterprise was in violation of *Apprendi v. New Jersey*, 530 U.S. 466 (2000). In addition, Lewis argues (1) that the district court made several sentencing errors, (2) that the court should have struck the jury panel, and (3) that the court should have prohibited the jury from reviewing government charts and the indictment during deliberations. Finding no reversible error, we affirm.

I.

The defendant, Thomas Lewis, met Charles Haas in 1981. Both men were members of the Hell's Angels and partners in a sizeable methamphetamine business. Haas, operating in California, shipped large amounts of methamphetamine to Lewis, who resided in Virginia. The shipments were generally in ten-pound quantities, which cost between $9,000 and $11,000 per pound. The methamphetamine was often transported in a Chevrolet El Camino that was driven by Haas, Russell Zink, or Jim Aggas.

Lewis and Haas eventually grew tired of the coast-to-coast trafficking in methamphetamine and decided to set up a methamphetamine lab in Virginia in November 1990. Lewis approached Daryl Benson, a long-time friend who was involved in the Hell's Angels, and offered him $50,000 to use his residence to manufacture methamphetamine. Benson agreed, and Lewis recruited several persons to help conduct the operation. Lewis enlisted Glenn Yank and Shelly Hoke to obtain

chemicals and glassware from New York. He also asked Russell Zink to acquire distilled water and aluminum foil for the manufacturing process, and he designated Yank to "cook" the methamphetamine.

After Lewis acquired the necessary components for the lab, Lewis, Yank, Benson, and Haas set up the lab at Benson's house. Lewis and Haas retained firearms at Benson's house, including an assault rifle, to provide security for the operation. While they were setting up the lab, Yank realized that they were missing Methylymine, an essential chemical in the methamphetamine manufacturing process. Yank then flew to New York to obtain the chemical. When he returned, he tried to cook the chemicals on two separate occasions to produce methamphetamine, but he was unsuccessful. Lewis thereafter employed Joseph Redish to cook the chemicals, but Redish's attempts also failed. After the failed attempts, the group decided to suspend the manufacturing operation, and Lewis instructed Benson to move the lab's components and materials to Genito Mini Storage in Chesterfield County, Virginia.

While Lewis struggled to set up a methamphetamine manufacturing operation in Virginia, he and Haas maintained their West Coast to East Coast drug trafficking operation. From February 1991 to March 1993 Lewis received ten to twelve pounds of methamphetamine one to two times per month (on two occasions Lewis received fourteen and twenty-two pounds, respectively). When the methamphetamine arrived from Haas, Lewis would contact Benson and Darrell Newman, who would "cut" and bag the drug. The three men often added Inositol (a cutting agent) to the methamphetamine, which allowed them to produce up to twenty-eight pounds of distributable product from each ten- or twelve-pound shipment.

Lewis was also engaged in distributing cocaine and marijuana. In the spring of 1991 Lewis contacted Yank in New York and asked him to obtain three kilograms of cocaine. Yank came to Virginia with the three kilograms, which he distributed on consignment to Lewis and Jim Aggas. Haas and Zink were present for this transaction. On another occasion in the spring of 1991 Benson bought three kilograms of cocaine from Scotty Barfield and then resold the drug for Lewis. In May 1991 Lewis bought 100 pounds of marijuana from a source in New Mexico and sent Zink to bring the marijuana to Virginia.

After Zink returned with the drug, Lewis sent him to Arizona to obtain an additional 100 pounds of marijuana.

Some of the proceeds of the drug sales were laundered through Evo-X, Inc., a company owned by Lewis's friend, Sean Gallagher. Gallagher helped set up Evo-X to launder money for Lewis and to provide Lewis with the appearance of holding down a lucrative job. (Lewis at that time was on parole and had to justify his high income and frequent travel to his parole officer.) In exchange, Gallagher profited from the money laundering operation and received quantities of methamphetamine and marijuana from Lewis.

Lewis remained determined to manufacture methamphetamine. He instructed Benson to research the manufacturing process. Benson came up with a list of chemicals necessary to make the drug and gave the list to Lewis. Lewis then gave the list to Haas, who set off for Canada to obtain the chemicals. Before Haas was able to cross the border into Canada, however, the Royal Canadian Mounted Police stopped him and recovered the list.

Shortly after Haas was denied entry into Canada, Drug Enforcement Administration (DEA) agents executed several search warrants on June 12, 1991. The agents first searched Genito Mini Storage and recovered glassware and chemicals that were capable of producing between 6.4 and 9.25 kg of D-L methamphetamine. The agents then searched Lewis's towing business, Big Tom's Towing, in Petersburg, Virginia. Lewis's towing operation was basically a front for illicit drug distribution. During this search the agents recovered 13.6 grams of powder cocaine. Both Zink and Lewis, who were present when the towing shop was searched, were arrested. The final search warrant was executed at Benson's residence. There, agents found various materials used in the methamphetamine manufacturing process, including Inositol. Benson was also arrested. Dorothy Barfield, the mother of Scotty Barfield, arranged for Lewis's release on bond and Lewis arranged for Benson's bond, using Cosmos Gilberti, a bail bondsman who frequently posted bail for members of the Hell's Angels.

Lewis became concerned that the federal government would prosecute him and Benson for manufacturing methamphetamine. Lewis

told Benson to leave Virginia and gave him $35,000 to travel to Massachusetts and contact "Doc" Paschutti, a member of the Hell's Angels. Benson did travel to Massachusetts, which meant that he was skipping bail. Later, Benson paid Gilberti $25,000 for the bond that Gilberti forfeited when Benson failed to appear in court. In November 1991, however, Benson returned to Virginia and contacted Lewis. Lewis provided Benson with an additional $20,000, an assault rifle and two pistols, one quarter pound of cocaine, and three quarters of a pound of methamphetamine. Benson then traveled to Maine, where he was again arrested.

On February 12, 1992, Lewis was traveling through the Minneapolis/St. Paul International Airport, where he bought a plane ticket to Arizona for $1,000 in the name of Carl Anderson. Airport security officers stopped Lewis and asked if they could search his person. The officers found over $11,000 on Lewis. Then, before calling in a drug dog, the officers hid the money in two separate locations in the airport concourse. The dog "hit" on the bundles of money. The officers seized the money, but Lewis was not arrested.

On June 23, 1993, law enforcement officers executed a search warrant at Lewis's residence, but they discovered that Lewis and most of his belongings were gone. By sometime around August 1993 Lewis and Zink made it to Apache Junction, Arizona, where they obtained false identifications. In early 1994 Zink and Lewis fled to Mexico, but Mexican authorities found them and took them into custody on March 7, 1994.

A grand jury handed down a twenty-five count indictment against Lewis on October 18, 1993. Because Lewis was a fugitive in Mexico and was not extradited to the United States until June 24, 1999, he did not make his first appearance in federal court until July 7, 1999. Lewis was tried by a jury from December 6 through 15, 1999. The jury convicted Lewis of conspiring to manufacture and distribute controlled substances in violation of 21 U.S.C. § 846 (count one), operating a continuing criminal enterprise (CCE) in violation of 21 U.S.C. § 848 (count two), conspiring to launder money in violation of 18 U.S.C. § 1956(g) (count three), possession with intent to distribute in excess of one kilogram of methamphetamine in violation of 21 U.S.C. § 841 (count ten), money laundering in violation of 18 U.S.C.

§ 1956(a)(1)(A)(i) (count sixteen), structuring a currency transaction to evade a reporting requirement in violation of 31 U.S.C. § 5324(a)(3) (count twenty-one), and attempting to manufacture methamphetamine in violation of 21 U.S.C. § 846 (count twenty-five).

The district court sentenced Lewis on April 5, 2000. The district court conditionally vacated the convictions on counts one, ten, and twenty-five because those convictions were lesser-included offenses of the CCE conviction. The court sentenced Lewis to a term of life for the CCE conviction, 240 months for the 18 U.S.C. §§ 1956(a)(1)(A)(i) and (g) convictions, and 60 months for the 31 U.S.C. § 5324(a)(3) conviction, with all terms running concurrently. Lewis appeals, raising several issues.

## II.

Lewis argues that the government failed to prove that he operated a CCE and, in the alternative, that his CCE conviction is unconstitutional in light of *Apprendi v. New Jersey*, 530 U.S. 466 (2000).

A person is liable for operating a CCE if

> (1) he violates any provision of this subchapter or subchapter II of this chapter the punishment for which is a felony, and
>
> (2) such violation is a part of a continuing series of violations of this subchapter or subchapter II of this chapter—
>
>> (A) which are undertaken by such person in concert with five or more other persons with respect to whom such person occupies a position of organizer, a supervisory position, or any other position of management, and
>>
>> (B) from which such person obtains substantial income or resources.

21 U.S.C. § 848(c). Therefore, to gain a CCE conviction, the government must prove that the defendant committed (1) a felony violation of the federal drug laws (2) as part of a continuing series of violations of the drug laws (3) in concert with five or more persons (4) whom he organized or supervised. Finally, the defendant must have (5) derived substantial income or resources from the endeavor. *See United States v. Wilson*, 135 F.3d 291, 303 (4th Cir. 1998). A "continuing series of violations" of the drug laws consists of at least three violations. *See United States v. Johnson*, 219 F.3d 349, 353 (4th Cir. 2000). The jury convicted Lewis of operating a CCE and specifically found that his conviction for conspiring to distribute controlled substances under 21 U.S.C. § 846 served both as the predicate offense for the CCE conviction and as one of the three underlying drug offenses that made up the continuing series of violations. On appeal Lewis claims that the government failed to prove that he operated a CCE. First, he argues that a violation of 21 U.S.C. § 846 cannot serve as both the predicate offense for a CCE, *see* 21 U.S.C. § 848(c)(1), *and* as one of the three underlying drug offenses that constitute a continuing series of violations, *see id.* § 848(c)(2). Second, Lewis asserts that no reasonable juror could have credited the testimony of the government's three primary witnesses. Finally, he contends that his CCE conviction is in violation of *Apprendi v. New Jersey*, 530 U.S. 466 (2000). All three of his contentions are without merit.

The plain text of 21 U.S.C. § 848 makes it clear that a drug conspiracy under § 846 can serve as the predicate offense for a CCE and as one of the three underlying drug violations. Section 848(c)(1) provides that "any" felony violation of the federal drug laws may constitute the predicate offense for a CCE. Lewis's conviction under 21 U.S.C. § 846 is undisputedly a felony violation of the federal drug laws. Section 848(c)(2) then *requires* that the predicate felony violation under § 848(c)(1) be "a part of a continuing series of violations." Thus, the predicate felony violation must also serve as one of the three underlying drug offenses required under § 848(c)(2). Because "any" felony drug violation can serve as the predicate offense and § 848(c)(2) requires the predicate offense to be a part of "a continuing series of violations," a violation of § 846 can serve as the predicate offense of a CCE and as one of the three underlying drug offenses necessary under § 848(c)(2).

Lewis also argues that the evidence was insufficient to sustain his conviction because three of the government's witnesses, Haas, Benson, and Yank, were not credible witnesses. Because all three of the men are convicted criminals, drug users, and cooperated with the United States, Lewis asserts that no reasonable juror could have credited their testimony. Lewis, however, misunderstands the scope of our review. "In reviewing the sufficiency of the evidence, we are not entitled to weigh the evidence or to assess the credibility of witnesses." *United States v. Romer*, 148 F.3d 359, 364 (4th Cir. 1998). *See also United States v. Arrington*, 719 F.2d 701, 704 (4th Cir. 1983) ("We, of course, do not weigh evidence or review the credibility of witnesses in resolving the issue of substantial evidence."). Because Lewis's sufficiency of the evidence claim is a run-of-the-mill attack on the credibility of key government witnesses, he raises an issue that is beyond our warrant.

Lewis next asserts that his conviction for operating a CCE is unconstitutional in light of *Apprendi v. New Jersey*, 530 U.S. 466 (2000). He claims that under the reasoning of *Apprendi*, 21 U.S.C. §§ 841 and 846 are unconstitutional on their face. He asserts that drug quantity under §§ 841 and 846 is a sentencing factor that must be decided by a judge. Lewis points out, however, that drug quantity is a fact that has the effect of increasing the maximum penalty for trafficking in illegal drugs, and therefore, under *Apprendi*, it must be submitted to a jury and proven beyond a reasonable doubt. Thus, he asserts that §§ 841 and 846 are unconstitutional because they require the issue of drug quantity to be decided by a judge and proven by a preponderance of the evidence. Because the jury found that his conviction under § 846 also served as the predicate offense for the CCE and was one of the three underlying offenses that constitute a "continuing series of violations," Lewis argues that the jury relied on an unconstitutional statute (§ 846) to convict him for operating a CCE. He therefore requests that we reverse the district court and vacate his CCE conviction. Our recent case of *United States v. Promise*, No. 99-4737, ___ F.3d ___ (4th Cir. June 29, 2001), forecloses Lewis's argument. In *Promise* we held that drug quantity is an element of the offense that must be submitted to a jury and proven beyond a reasonable doubt. *See Promise*, slip op. at 9-11. Thus, contrary to Lewis's assertion, §§ 841 and 846 do not require the issue of drug quantity to

be decided by a judge. Because drug quantity must be submitted to the jury, both sections survive *Apprendi*.

### III.

Lewis challenges the district court's application of the U.S. Sentencing Guidelines. Lewis first argues that the district court's finding of a base offense level of 43 was erroneous. He asserts that the district court's findings regarding drug calculations, drug type, and enhancements for possessing a firearm and obstructing justice were improper. In addition, Lewis claims that the district court improperly determined that his criminal history category was IV. He contends that because the district court should not have counted a conspiracy conviction in determining his criminal history category, his category is actually III.

The Government must prove all factors that warrant a sentencing enhancement by a preponderance of the evidence. *See United States v. Urrego-Linares*, 879 F.2d 1234, 1237-38 (4th Cir. 1989). In reviewing the district court's determinations regarding the Sentencing Guidelines, "this court must give deference to the district court's decision." *United States v. Nale*, 101 F.3d 1000, 1003 (4th Cir. 1996). "The amount of deference due a sentencing judge's application of the guidelines to a specific set of facts depends upon whether the issue is primarily a factual or legal one." *Id.* We review factual determinations for clear error and legal interpretations de novo. *Id.* On guidelines decisions involving mixed questions of law and fact, we apply a "due deference" standard in conducting our review. *Buford v. United States*, 121 S. Ct. 1276, 1279 (2001). Under a due deference standard, if the mixed question is "'essentially factual' . . . the district court's determination should be classified as one of fact reviewable under the clearly erroneous standard. If, on the other hand, the question requires us to consider legal concepts in the mix of fact and law and to exercise judgment about the values that animate legal principles, then the concerns of judicial administration will favor the appellate court, and the question should be classified as one of law and be reviewed de novo." *United States v. Daugherty*, 874 F.2d 213, 217-18 (4th Cir. 1989) (quoting *United States v. McConney*, 728 F.2d 1195, 1202 (9th Cir. 1984) (en banc)).

A.

Lewis claims that the district court improperly found that Lewis was responsible for over 260 pounds of methamphetamine and three kilograms of cocaine. Based on the testimony of Haas, Benson, and DEA Agent Berrymond Burgess, the district court found that Lewis received methamphetamine from Haas between February 1991 and May 1993 one to two times per month and that the shipments averaged ten to twelve pounds (on two occasions he received fourteen and twenty-two pounds, respectively). Lewis asserts, however, that the testimony of Haas and Benson does not establish that he received a minimum of 260 pounds. Lewis contends that Haas testified that he made only ten shipments to Lewis and that Benson said that Haas made one to two shipments per month from February 1991 to June 1991. Although Lewis concedes that Burgess testified that Haas admitted to him that Lewis received at least ten pounds of methamphetamine one to two times per month for over two years, Lewis contends that Burgess's testimony regarding Haas's statements is hearsay and should not have been considered by the district court.

The district court's drug calculation is not clearly erroneous. Although Burgess's testimony regarding Haas's statements is hearsay, the district court properly considered this testimony in calculating drug quantity. *See United States v. Uwaeme*, 975 F.2d 1016, 1021 (4th Cir. 1992) (recognizing that the district court may consider any relevant information, including hearsay evidence, provided that the information has "sufficient indicia of reliability to support its probable accuracy" (quoting *U.S. Sentencing Guidelines Manual* § 6A1.3(a) (1991))). In addition, Burgess's testimony is consistent with Haas's and Benson's testimony. Haas said that he shipped methamphetamine to Lewis more than ten times, and Benson simply testified to the period between February 2001 and June 2001. Their testimony, however, does not undermine Burgess's testimony that Haas told him that he shipped at least ten pounds of methamphetamine to Lewis one to two times per month for over two years. Thus, the district court's factual finding that Lewis received over 260 pounds of methamphetamine was not clearly erroneous.

Lewis also contends that the district court should not have attributed three kilograms of cocaine to him in determining his offense

level. He asserts that there was insufficient evidence to link him to any cocaine transaction. Lewis's claim is meritless. Yank testified at trial that he purchased three kilograms of cocaine for Lewis and distributed the cocaine to Lewis in the presence of Haas, Aggas, and Zink. In addition, Benson testified that he sold three kilograms of cocaine for Lewis and gave Lewis the proceeds of the sale. Therefore, the district court did not clearly err in calculating the quantity of cocaine attributable to Lewis.

B.

Lewis argues that the district court should have used the 1992 version of the *U.S. Sentencing Guidelines Manual* to determine his sentence for operating a CCE instead of the 1998 version. *U.S. Sentencing Guidelines Manual* § 1B1.11(a) (hereinafter U.S.S.G.) provides that the district court "shall use the Guidelines Manual in effect on the date that the defendant is sentenced." If, however, the district "court determines that use of the Guidelines Manual in effect on the date that the defendant is sentenced would violate the *ex post facto* clause of the United States Constitution, the court shall use the Guidelines Manual in effect on the date that the offense of conviction was committed." U.S.S.G. § 1B1.11(b)(1). "[T]he last date of the offense of conviction is the controlling date for *ex post facto* purposes." U.S.S.G. § 1B1.11 cmt. 2. The controlling date is "the last date of the offense, as alleged in the indictment." *United States v. Fitzgerald*, 232 F.3d 315, 318-19 (2d Cir. 2000). Here, Lewis was sentenced in April 2000, but the last date of the offense of conviction was October 1993, according to the indictment.

The district court applied the 1998 Guidelines because it was the version in effect on the date that Lewis was sentenced. Lewis argues, however, that the district court's application of the 1998 version of the Guidelines was in violation of the Ex Post Facto Clause. Lewis asserts that he trafficked in L-methamphetamine. He then points out that under the 1992 version of the Guidelines a distinction is made between L-methamphetamine and D-L methamphetamine. Under the 1992 version a defendant receives a lower offense level for trafficking in L-methamphetamine. *See* U.S.S.G. § 2D1.1 (1992). The 1998 version, however, abolished the distinction between L-methamphetamine and D-L methamphetamine. *See* U.S.S.G. § 2D1.1 (1998). The 1998

amendment therefore had the effect of increasing the offense level for trafficking in L-methamphetamine while the offense level for D-L methamphetamine remained the same. *Compare* U.S.S.G. § 2D1.1 (1998) *with* U.S.S.G. § 2D1.1 (1992). Because the 1998 version of the Guidelines imposes a higher offense level for trafficking in L-methamphetamine than the 1992 Guidelines, Lewis contends that the district court should have sentenced him under the 1992 version (the version in effect on the last date of the offense of conviction).

The government claims that Lewis's argument lacks merit because the district court found that he trafficked in D-L methamphetamine. If Lewis had trafficked in D-L methamphetamine, the government correctly notes that his sentence would be the same regardless of whether the district court applied the 1998 or 1992 version of the Guidelines. A comparison of the 1992 and 1998 versions of the Guidelines shows that the 1998 amendment did not affect the offense level for D-L methamphetamine. *Compare* U.S.S.G. § 2D1.1 (1998) *with* U.S.S.G. § 2D1.1 (1992).

Lewis contends that the government failed to prove by a preponderance of the evidence that he trafficked in D-L methamphetamine, and therefore the district court should have found that he distributed L-methamphetamine. We disagree. The government introduced sufficient evidence for the district court to find that Lewis received and distributed D-L methamphetamine. DEA Agent Kevin Pakulniewicz testified that the chemicals and manufacturing materials found at Benson's residence and Genito Mini Storage indicated that Lewis could have produced between 6.4 and 9 kg of *D-L* methamphetamine. In addition, law enforcement officials recovered D-L methamphetamine during a search of Sean Gallagher's home. Because Lewis supplied Gallagher with the methamphetamine that law enforcement discovered and Lewis obtained all of his methamphetamine from Haas in California, it appears that the methamphetamine Lewis was receiving from California was D-L methamphetamine. Moreover, Pakulniewicz testified that a market did not exist for the illicit distribution of L-methamphetamine and that the only forms of methamphetamine that were being trafficked from 1990 to 1997 were D-L and D-methamphetamine. Given this evidence, the district court's determination regarding drug type is not clearly erroneous. Thus, the court's application of the 1998 version of the Guidelines was proper.

## C.

Lewis next claims that there is insufficient evidence to support the district court's sentence enhancements for firearms possession and obstructing justice. *See* U.S.S.G. §§ 2D1.1(b)(1), 3C1.1 (1998). The record, however, amply supports the district court's enhancements. First, Benson testified that Lewis supplied him with an assault weapon and two firearms and that Lewis retained firearms at Benson's residence while they constructed the methamphetamine lab. Therefore, the district court's finding that Lewis possessed firearms is not clearly erroneous. Second, Benson testified that Lewis helped him escape the authorities in Virginia and flee to New England. Lewis instructed Benson to leave Virginia and provided him with $55,000, an assault rifle, two pistols, one quarter pound of cocaine, and three quarters of a pound of methamphetamine. Thus, the district court's finding that Lewis obstructed justice is also not clearly erroneous.

## D.

Lewis asserts that the district court improperly determined that the applicable criminal history category for his sentencing range was IV. He claims that the district court's inclusion of a 1986 drug conspiracy conviction in its criminal history determination was improper because the 1986 conviction involved conduct that was a part of the continuing criminal enterprise at issue in this case.

Lewis fails to explain, however, how the 1986 conspiracy was a part of the same course of conduct as the continuing criminal enterprise in this case. Moreover, Lewis seems to have conceded at trial that the 1986 conspiracy was unrelated to the conduct at issue in this case. At trial Lewis objected to the government's use of evidence regarding the 1986 conspiracy on the ground that it was unrelated to the conduct charged in the indictment. The district court agreed with Lewis and sustained his objection. Because Lewis has failed to show that the 1986 conspiracy was a part of the continuing criminal enterprise in this case, we hold that the district court's criminal history determination was correct.

## IV.

Lewis argues that the district court should have struck the jury panel because a potential juror made an inflammatory remark during

voir dire on the first day of trial. During voir dire a potential juror who worked as a counselor at a correctional facility indicated that he could not be a fair and impartial juror in Lewis's case "[b]ecause 95 percent of my case load are blacks who are in for doing small amounts of drugs. I couldn't be fair to that man, because I think automatically, going there, if he has been charged with it, he should burn." The district court struck the potential juror but decided that it would not strike the entire jury panel. Lewis claims that the counselor's statement had such a "harmful and prejudicial effect" on the jury that the district court was obligated to strike the jury panel. We note that a district court's findings of juror impartiality may "be overturned only for manifest error." *Mu'Min v. Virginia*, 500 U.S. 415, 428 (1991). Thus, the failure to strike a jury panel is reviewed for a manifest abuse of discretion. *See United States v. Trujillio*, 146 F.3d 838, 842 (11th Cir. 1998).

The district court's decision to retain the jury panel was not an abuse of discretion. The court addressed the jury and throughly discussed the comments made by the counselor. It also issued a detailed limiting instruction and probed the jury for bias. The court instructed:

> All right. Ladies and gentlemen, I am going to tell you that as a matter of law under our constitution and our system of justice it is absolutely inappropriate to take into account the race of a defendant, whether white or black. Absolutely inappropriate to take into account the race of a lawyer in the case, whether white or black. Or absolutely inappropriate and not permitted to take into account the race of a defendant — whether — or, I mean of a witness, whether white or black.
>
> And if I tell you that now, is there anybody now who could not abide by my instruction that you can't consider that in any way, shape, form or fashion in deciding the case? Anyone who cannot? Alright.
>
> Now, the other thing I am going to tell you is that punishment for a crime is absolutely not to be considered by a jury in arriving at a determination of whether someone is guilty or not, that is, whether the United States has met its burden

of proof beyond a reasonable doubt. The reason for that is because in the federal system the judge decides what the punishment is. The jury doesn't decide that. And if I tell you that you might not take into account the fact of what the punishment for a crime might be, is there anybody who in deciding guilt or innocence, is there anybody who could not abide by that instruction?

The district court then inquired further to make sure that the counselor's comments did not prejudice the jury. The court asked:

I have told you that [the counselor's] attitude is wrong in every respect. It is something that can't be considered. . . .

[I]s there anybody here who, who needs to talk to me about this, has any hesitation about it, that you would like to talk to me privately up here? Because the law is that this defendant and the United States are to have a fair trial based on proper and legal consideration, just as you would like to have such a fair trial were an indictment brought against you. And you would not want anyone influenced by a statement such as this. And so if you have any hesitation about whether this might affect your impartiality, I would like to know about it now, because it will be too late when we pick the jury. All right, ladies and gentlemen.

In addition, the court expressed its disdain for the counselor's statements in front of the jury and concluded that the counselor's statements did not prejudice the jury:

I think the motion to strike the panel is denied. I believe that the [statement] was clearly out of line, it was inappropriate, and injected improper consideration. And I believe the questioning of the jury has cured any difficulty, and I think the record is clear now exactly what the jury heard . . . and that they did hear it, and I think it is just as clear they won't let that affect them. And frankly, my assessment is that they were, from looking at the faces of the people out there, they were as offended by the statement as counsel for the defendant and I was . . . so the motion is denied.

The defendant has offered no evidence to suggest that the jury failed to follow the district court's instructions or that the court's findings regarding lack of jury bias were in error. *See United States v. Ellis*, 121 F.3d 908, 928 (4th Cir. 1997) (holding that juries are presumed to follow a court's instructions and that a juror's improper remarks require reversal only when they "infect[ ] the trial with unfairness as to make the resulting conviction a denial of due process"). Because the district court took several steps to assess the impact of the counselor's statements on the jury panel, issued curative instructions, and found that counselor's statements did not prejudice the jury, we conclude that the court's failure to strike the jury panel was not an abuse of discretion.

V.

Lewis claims that his due process rights were violated by the district court's decision to allow the jury to review the indictment and the government's charts during deliberations. This decision is reviewed for an abuse of discretion. *See United States v. Ward*, 171 F.3d 188, 195 (4th Cir. 1999). The admission of a chart "will not be overturned on appeal unless [the] decision is shown to be arbitrary or irrational." *United States v. Loayza*, 107 F.3d 257, 264 (4th Cir. 1997) (quoting *United States v. Johnson*, 54 F.3d 1150, 1156 (4th Cir. 1995)) (alteration in original). In addition, "[t]he submission of an indictment to the jury is a discretionary matter with the district court." *United States v. Polowichak*, 783 F.2d 410, 413 (4th Cir. 1986).

The admission of the charts was neither arbitrary nor irrational. The government sought to introduce the charts to summarize extensive financial evidence regarding Lewis's money laundering activities. Such charts are permitted expressly under Fed. R. Evid. 1006, which provides, "The contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation." The district court gave Lewis the opportunity to challenge the charts' conclusions and summaries and to cross-examine Internal Revenue Service Agent Robin Rager, who testified as to the contents of the charts. In addition, the court told the jury that it should give the charts "such weight as you feel like that you are entitled to. If you do not think

they are entitled to any weight, you don't have to give them any weight."

Also, the submission of the indictment to the jury was not in error. We held in *United States v. Polowichak* that

> [t]he submission of an indictment to the jury is a discretionary matter with the district court. If the indictment contains irrelevant allegations, ordinarily they should be redacted. But where, as here, the jury is unequivocally instructed that the indictment is not evidence, that the indictment is distributed solely as an aid in following the court's instructions and the arguments of counsel, and that certain counts should be disregarded as irrelevant to the defendants currently before the district court, we perceive no reversible error.

783 F.2d at 413 (citations omitted). Here, the district court followed the requirements of *Polowichak*. The court redacted several overt acts alleged as part of the violation of 21 U.S.C. § 846 in Count One of the indictment and several irrelevant acts alleged as part of the violation of 18 U.S.C. § 1956(g) in Count Three. The court also eliminated from the indictment the names of Lewis's coconspirators and allegations of forfeiture. Moreover, the court specifically instructed the jury that the indictment should not be considered as evidence. *See* Gov't Br. at 65 n.15. Lewis does not claim that the redactions were insufficient or that the court's instructions were inadequate. Thus, because the court redacted the indictment and properly instructed the jury regarding the use of the indictment, the court's decision to allow the jury to review the indictment and charts was not an abuse of discretion.

## VI.

For the foregoing reasons, we affirm Lewis's conviction and sentence.

*AFFIRMED*