IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs May 19, 2020

**STATE OF TENNESSEE v. DEMONICA GORE**

**Criminal Court for Shelby County**
**No. 16-00317**

**No. W2019-01320-CCA-R3-CD**

The Defendant-Appellant, Demonica Gore, was convicted by a Shelby County jury of aggravated robbery and received a sentence of twelve years' imprisonment. In this appeal as of right, the Defendant presents the following issues for our review: (1) whether the trial court erred in sustaining the State's objection to defense counsel's question during voir dire concerning the juror's views on police confessions; (2) whether the evidence was sufficient to sustain the conviction; and (3) whether the trial court erred in imposing the maximum sentence of twelve-years' imprisonment.[1] Upon our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and J. ROSS DYER, JJ., joined.

Eric Mogy, Memphis, Tennessee, for the Defendant-Appellant, Demonica A. Gore.

Herbert H. Slatery III, Attorney General and Reporter; Samantha L. Simpson, Assistant Attorney General; Amy Weirich, District Attorney General; and Jamie Kidd, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

The victim in this case, Rickey Scruggs, was lured to the scene of the offense by his friend, Alexis Bell, who called him on the day of the offense under the guise of purchasing some marijuana. When the victim met Bell in the breezeway of his apartment complex, he was accosted by two other individuals. One individual pointed a gun to the back of the victim's head while the other individual took the victim's belongings. The perpetrators

---

[1] We have re-ordered the Defendant's issues for clarity.

ordered the victim to undress, grabbed Bell's purse, and ran away. Based on subsequent investigation, law enforcement determined that Bell set up the robbery, the Defendant and co-defendant Jeremy Featherstone were armed with guns during the robbery, and another individual, Aqua Herman, helped to dispose of the guns after the offense. The Defendant gave a statement to police and confessed to the robbery of the victim at gunpoint. All four individuals were later indicted for their involvement in the offense,[2] and the following proof was adduced at the Defendant's trial.

At the time of the offense, Alexis Bell had been in a romantic relationship with the Defendant for two-and-a half years. She testified that on January 24, 2014, she was in east Memphis with the Defendant and Jeremy Featherstone. She was later dropped off at the apartment complex where the robbery occurred. When she was dropped off, the Defendant and co-defendant Featherstone went to the store. Bell called the victim, a friend she had known from high school, and asked to purchase marijuana, and he agreed. When Bell went to purchase the marijuana, she realized she did not have her purse or any money. The victim told her to go get it, and he would meet her half-way from the apartment. When she walked out the door, the Defendant and co-defendant Featherstone met them at the door. Bell observed the Defendant put a gun to the victim's head and heard the Defendant order him to undress. She observed co-defendant Featherstone "just grabbing everything that [the Defendant] told him to take off" of the victim. Bell was shoved back inside the apartment, and the victim called the police.

Twenty to thirty minutes later, the Defendant picked up Bell from the apartments in a different car than the one she had been in earlier that day. They drove to a location off Kirby and Quince Road, where Bell observed the Defendant empty the victim's clothes into a garbage can. Two or three hours later, Bell received a telephone call from the police to come to the station, and she complied. Once at the station, Bell provided a statement concerning the robbery and reported that the perpetrator was someone named Paul. She explained she had been coerced to identify someone other than the Defendant. However, she later told the truth and identified the Defendant and co-defendant Featherstone as the perpetrators of the robbery. She was unaware of the Defendant's and the co-defendant Featherstone's plan to rob the victim prior to the robbery.

---

[2] The Defendant and Jeremy Featherstone were indicted jointly for the aggravated robbery of the victim in violation of Tennessee Code Annotated section 39-13-402 (count one); Alexis Bell was indicted for facilitation of aggravated robbery of the victim by the Defendant and Jeremy Featherstone in violation of Tennessee Code Annotated section 39-13-403 (count two); Aqua Herman was also indicted for tampering with evidence, false reporting, accessory after the fact in violation of Tennessee Code Annotated sections 39-16-503, 39-16-502, and 39-11-411 (counts three, four, and five). The Defendant was tried alone.

On cross-examination, she agreed that she originally told police that "Scooby and Paul" were the perpetrators of the robbery and that Scooby was Featherstone's nickname. She reiterated that she was coerced by the Defendant to provide these names to the police. She estimated that she was "halfway" out of the door when the Defendant pushed her back inside the apartment. The Defendant was wearing a hoodie over her face; however, Bell observed parts of her face and the tattoos on the Defendant's hands. She agreed she had received a favorable settlement of her case from the State in exchange for truthful testimony against the Defendant. She admitted she initially denied any involvement in the instant offense.

Rickey Scruggs, the victim, was living in Autumnwood Apartments at the time of the offense and considered Alexis Bell, whom he had known from high school, to be a friend. Around noon on the day of the offense, he spoke with Bell and agreed to sell her some marijuana. He intended to meet Bell a few feet from his apartment door or from "breezeway to breezeway." He met Bell, who was initially alone, and they walked back toward his apartment. As Bell opened the door to step into the apartment, the victim was "bumped" and held at gunpoint. The victim said there were two perpetrators involved in the offense. One perpetrator pointed a gun at his chest and face. The victim described the gun as a "black like Tic 9" with a round barrel similar to an "Uzi simulation." He identified a gun during his testimony, which was recovered from the home of Aqua Herman and later admitted as an exhibit, as the same gun used to rob him. One perpetrator told him to "take everything out of his pocket and drop it off." Fearing for his life, the victim complied. The perpetrators wore masks and forced the victim to look down. However, the victim saw one of the perpetrators and felt the presence of the other, who held a gun to the back of his head. The perpetrators forced the victim to undress, and the victim took off his jacket and sweatpants. The victim said he was wearing a "Jordan jacket," which he described as "unique" based on the inside grey color "dragged with the little lines like the shows have on them." The victim identified his jacket at trial, admitted as an exhibit, as the one that was taken from him during the offense.

The victim said he also had an iPhone and "a bag of weed" inside his pants pocket. He did not give the perpetrators permission to take any of these items from him. The perpetrators grabbed Bell's purse and ran away. Shortly thereafter, the victim ran to his apartment, put on some clothes, and went to the police station to report the robbery. He was unable to identify the perpetrators because they wore masks; however, he described the perpetrator who held the gun to his head as follows:

Probably slim build, probably a hundred, hundred and forty, hundred and fifty pounds. Five eleven or six feet. Tall. Their dreadlocks still going from under the mask.

On cross-examination, the victim agreed that he identified someone other than the Defendant as the perpetrator of the offense in a police photographic line-up, which was admitted as an exhibit. The victim denied being "high" at the time of the photographic line-up procedure. The victim agreed that he initially advised the police that the perpetrators were two Black males and that the perpetrators fled the scene in a blue Mustang. The victim had known the Defendant from high school or for eight or nine years and considered her to be a friend. The victim further acknowledged that his jacket did not contain his initials and that he previously had been in a romantic relationship with Bell when they were in high school. The victim also agreed he had a prior aggravated burglary conviction and received a sentence of probation. The victim estimated the robbery lasted between four and five minutes.

Cassandra Franklin, who also lived in the Autumnwood Apartments, testified that on the day of the offense she called the Defendant to purchase marijuana. The Defendant asked Franklin if Bell could stay at her apartment while the Defendant visited another friend, and Franklin agreed. Franklin said that Bell kept going in and out of the apartment while she was waiting for the Defendant. Franklin heard scuffling outside of her apartment; however, she did not observe the robbery. Bell later asked Franklin to take her to a store to meet the Defendant, and Franklin agreed. Once at the store, Bell got out of Franklin's car and met the Defendant, who was with another male individual unknown to Franklin. On cross-examination, Franklin clarified that she took Bell to the store approximately fifteen minutes after the robbery. She said that Bell had her purse and that the Defendant was in a black, four door sedan, when she dropped Bell off at the store.

Aqua Herman was in a dating relationship with the Defendant at the time of the offense. She testified that on the day of the offense, the Defendant had possession of her truck, a 2005 red, Ford Explorer. The Defendant picked up the truck from Herman's workplace earlier in the day and had returned it later that night. Two days after the offense, the Defendant told Herman that the Defendant and Bell had robbed the victim. The Defendant told Herman that "guns [were] in [her] truck[.]" That same night, Herman discovered "guns . . . in a City Gear bag" in her truck. Herman retrieved the bag, which she confirmed contained two guns, and put it on a top shelf in her home. Herman denied putting the guns in her truck and agreed the only other person who had the ability to do so was the Defendant. Herman denied any prior knowledge of the robbery or an attempt to cover up the crime. She said she secured the guns in her home for the safety of her four-year old daughter. When Herman was contacted by the police, she advised them about the guns and that the Defendant had put them in her truck.

On-cross examination, Herman agreed she was charged with being an accessory after the fact and theft of property for her involvement in the instant case. She had not yet entered a guilty plea and had not been provided with a specific offer from the State for her testimony against the Defendant. Herman explained that she was in a casual dating

4

relationship with the Defendant, and Herman was aware the Defendant was also dating Bell at the time of the offense.

Tristan Brown, a crime scene officer with the Memphis Police Department (MPD), testified that on January 27, 2014, she photographed and collected evidence from Herman's residence. Specifically, Officer Brown recovered a City Gear bag with clothing inside of it and two guns, all of which was admitted as evidence at trial. One of the guns, a "TEC-9," had been previously identified by the victim as the same weapon used to perpetrate the offense.

Marlon Carter was an MPD investigator assigned to the Ridgeway Station at the time of the offense. On May 25, 2014, Investigator Carter advised the Defendant of her rights under Miranda, which she waived and provided a statement. The advice of rights form and the statement were admitted as exhibits at trial. Within the statement, the Defendant admitted that she and "Scooby" robbed the victim of marijuana. She specifically stated:

> I took my girl Alexis to [apartment address] to do somebody's hair. I got out of my car to holler at my boy Scooby. Scooby asked me if I had some weed and I told him no. He stated that we – he state[d] that he knew a guy named Rickey who kept weed on him and suggested that we could rob him and take his weed.

> Me and Scooby stood there in the parking lot and before Scooby could call Rickey we saw Rickey walking across the parking lot and Rickey served Scooby with some weed. After that Scooby walked up behind Rickey and pulled Rickey's hoodie over his head and pulled his gun on Rickey and stated where it's at man. Rickey said man, don't do that and Scooby said stop messing around, I got one in the chamber. At the same time Alexis was coming out of the apartment so that she could not – would not get hurt.

> Scooby made Rickey take off all his clothes and then Scooby went through Rickey's pants pockets and pulled out two seven grams. Scooby gave me . . . one and he kept one, the other, and . . . we went our separate ways.

The Defendant said she drove to the apartment location in a 2008, black Forenza Suzuki. She denied that Alexis Bell was involved in the robbery.

Detective Denetta Craig of the MPD was the lead investigator in this case. On the day of the offense she too was assigned to Ridgeway Station, a general investigation or "catchall" bureau. Detective Craig said Alexis Bell helped to set up the robbery, the Defendant and Jeremy Featherstone acted as armed gunman during the robbery, and Aqua

Herman concealed the guns used in the robbery after the fact. Detective Craig also went to the home of the Defendant's mother, who signed a consent form permitting a search of the residence. During the search, an empty TEC-9 gun box, admitted as an exhibit at trial, was recovered, photographed, and seized. The box contained a portion of a serial number, which read as 11776. Detective Craig also accessed the Facebook page of the Defendant, and on January 27, 2014, she printed a photograph of the Defendant holding a TEC-9 gun. The photograph was admitted into evidence as an exhibit. On cross-examination, Detective Craig was shown two photographic line-up arrays. She agreed that a photograph of the Defendant was included in each array; however, the Defendant was not identified as the perpetrator. Both photographic arrays were admitted into evidence at trial.

The State rested its case, and the Defendant did not offer any proof at trial. The jury convicted the Defendant as charged of aggravated robbery. Following a sentencing hearing on May 9, 2019, the trial court imposed a twelve-year sentence of imprisonment. The Defendant filed a motion for new trial, which was subsequently denied by the trial court. This timely appeal followed.

## ANALYSIS

**I. Voir Dire.** The Defendant argues the trial court erred in sustaining the State's objection during voir dire to defense counsel's question to the jury venire concerning their beliefs about confessions. In failing to allow this line of questioning, the Defendant claims she was denied the opportunity to investigate prospective juror's beliefs concerning statements made to the police and that "it potentially affected the [her] ability . . . to ensure she had a jury she felt comfortable with." Relying primarily upon State v. Kimberly C. Hodge, No. M2007-00940-CCAR3CD, 2009 WL 774461, at *20 (Tenn. Crim. App. Mar. 25, 2009), the State argues the trial court properly limited the Defendant's questions about the voluntariness of her confession during voir dire. Upon our review, we conclude that the trial court erred in prohibiting defense counsel from exploring the views of the jury regarding confessions or statements to police.

The record shows that following a lengthy description of the difference between the burden of proof in a civil and criminal case, defense counsel asked the prospective jury, "Now, for those of you [] lucky enough to stick around you will probably hear that there is a confession involved in this case. And how many, before I ask any further questions, absolutely believe they would never confess or state that they did something when in reality that they didn't do it?" A prospective juror asked defense counsel to repeat the question. Defense counsel rephrased and asked, "How many people in here think they would never admit to doing something that they actually did not do?" On this question, the State objected and asked to approach the bench.

At the bench conference, the State advised the trial court that it had not yet decided whether to introduce the confession and counsel's comments were therefore inappropriate.

The State further explained that defense counsel's comments were premature because its decision to introduce the Defendant's statement was contingent on the testimony of two other cooperating witnesses. In response, defense counsel explained that he had only provided a "figurative," which we interpret to mean hypothetical. The trial court sustained the objection and urged defense counsel to "stay away from that" or rephrase the question without getting into the proof. The record does not reflect any additional questioning concerning confessions or statements to police.

Among the most essential responsibilities of defense counsel is to protect his client's constitutional right to a fair and impartial jury by using voir dire to identify and ferret out jurors who are biased against the defense. Morgan v. Illinois, 504 U.S. 719, 726-27, 112 S. Ct. 2222 (1992). The right to a trial by an impartial jury is guaranteed by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and Article I, section 9 of the Tennessee Constitution. State v. Davidson, 509 S.W.3d 156, 193 (Tenn. 2016); State v. Carruthers, 35 S.W.3d 516, 559 (Tenn. 2000). "A voir dire examination is for the purpose of advising counsel of the juror's qualification, interest, or bias . . . [and] [t]he subjacent purpose is to enable the exercise of one's peremptory challenges." Smith v. State, 205 Tenn. 502, 327 S.W.2d 308 (1959). The voir dire process also ensures that jurors "are competent, unbiased, and impartial, and the decision of how to conduct voir dire of prospective jurors rests within the sound discretion of the trial court." State v. Cazes, 875 S.W.2d 253, 262 (Tenn. 1994); State v. Howell, 868 S.W.2d 238, 247 (Tenn. 1993) (citing State v. Harris, 839 S.W.2d 54, 65 (Tenn.1992); State v. Simon, 635 S.W.2d 498, 508 (Tenn.1 982); Mu'Min v. Virginia, 500 U.S. 415, 111 S. Ct. 1899 (1991)). "The control of voir dire proceedings rests within the sound discretion of the trial court, and this court will not interfere with the exercise of this discretion unless clear abuse appears on the face of the record." State v. Reid, 213 S.W.3d 792, 835 (Tenn. 2006) (citing State v. Howell, 868 S.W.2d 238, 247 (Tenn.1993), cert. denied, 510 U.S. 1215, 114 S. Ct. 1339(1994)); see also Tenn. R. Crim. P. 24(a), (b) ("[The court] shall permit the parties to ask questions for the purpose of discovering bases for challenge for cause and intelligently exercising peremptory challenges.").

In State v. Kimberly C. Hodge, No. M2007-00940-CCA-R3-CD, 2009 WL 774461, at *20 (Tenn. Crim. App. Mar. 25, 2009), the Defendant argued that she was denied a fair and impartial jury based on the refusal of the trial court "to allow [defense] counsel to question prospective jurors concerning their willingness to consider factors related to the voluntariness of her statement[.]" Based on the record, it was unclear whether defense counsel actually posed a question regarding the voluntariness of the statement or merely intimated that the jury could ignore the law when the State lodged its objection. Id. The State objected, arguing that defense counsel was precluded from asking a question concerning the voluntariness of the statement because it was a "hotly contested" issue and the trial court had already determined its admissibility. Defense counsel insisted the jury could still consider the facts as to the "voluntariness of the statement" and requested

permission to ask the jury to consider certain specific factors pertaining to the voluntariness of the statement.

In denying relief, this court relied upon well settled law. After the trial court determines the admissibility of the confession, the jury determines the weight to be given the confession and whether the statements contained therein are true. State v. Kimberly C. Hodge, 2009 WL 774461, at *21 (internal citations omitted). We additionally noted that in United States v. Price, 888 F.2d 1206 (6th Cir. 1989), the Sixth Circuit flatly rejected a similar issue and noted

> Neither due process, nor the right to an impartial jury, nor sound reasoning and logic require that trial judges specifically present the venire with the most incriminating, disputed pieces of the government's case *simply because they are so incriminating.*

Id. (emphasis in original). The Sixth Circuit in Price reasoned that requiring the trial court to do so would (1) "result in the disqualification of most (honest) prospective jurors;" (2) "require prospective jurors to determine, before being properly presented with the evidence and observing the witnesses' demeanor, whether or not an important disputed event took place or statement was made;" (3) "allow both sides to introduce, comment upon and possibly mischaracterize the evidence which is to be introduced in the course of the trial;" and (4) "be an intrusion on the trial judge's traditional broad discretion in conducting voir dire." Id. at 1211.

Hodge does not stand for the broad proposition that a defendant may not explore the views of the jury on confessions or statements to police as suggested by the State. Rather, Hodge rejected presenting to the jury the narrow question of the voluntariness of a confession, a legal determination to be made by the trial court. There was no motion to suppress involved in this case and the questioning in voir dire did not involve the voluntariness of the Defendant's confession or an attempt to nullify the jury. Accordingly, we find Hodge inapplicable here.

When defense counsel asked, "How many people in here think they would never admit to doing something that they actually did not do[,]" the State objected presumably based on the question being tethered to defense counsel's mentioning the confession earlier in his comments. The Defendant argues he is entitled to relief because the State objected because it was unsure of whether it would use her confession, the trial court sustained the objection on this ground, and the State subsequently introduced the confession. We agree with the Defendant that the State's objection was specious and that there was nothing improper about this question. It broached the concept of false confessions, a legitimate phenomenon and commonly used theory of defense to confessions or statements given to police. See e.g., Corley v. United States, 556 U.S. 303, 320-21, 129 S. Ct. 1558, 1570, 173 L. Ed. 2d 443 (2009) (citing Steven A. Drizin & Richard A. Leo, The Problem of False

8

Confessions in the Post-DNA World, 82 N.C.L.Rev. 891, 906-907 (2004)) (noting "there is mounting empirical evidence that [custodial police interrogation] can induce a frighteningly high percentage of people to confess to crimes they never committed"). In our view, this question was fairly designed to uncover any predisposition or bias against the notion that an individual would confess to a crime for any other reason than guilt. Indeed, as borne out by the defense theory in closing argument, the Defendant argued she falsely confessed to the aggravated robbery to protect her girlfriend, who was eventually charged as an accomplice to the crime.

While we conclude that the trial court unreasonably restricted defense counsel's questioning of prospective jurors, any error in doing so here was harmless beyond a reasonable doubt. The Defendant makes no attempt to argue or establish prejudice. Additionally, the trial court permitted defense counsel to rephrase the question without explicit reference to the instant confession; however, defense counsel abandoned any further questioning on this issue. We also have no evidence that the Defendant exercised or exhausted her peremptory challenges, and the record otherwise shows that the jury as sworn was fair and impartial. Finally, the proof at trial absent the Defendant's confession to police established the elements of the offense beyond a reasonable doubt. Accordingly, the Defendant is not entitled to relief as to this issue.

**II.    Sufficiency of the Evidence.**    The Defendant argues the evidence was insufficient to support a conviction of aggravated robbery because the State failed to prove (1) she was involved in the robbery and (2) she possessed a weapon during the robbery. The Defendant further asserts that the victim advised the police that the perpetrators were two men and failed to identify her in a photographic line-up. In response, the State contends, and we agree, that the evidence is sufficient to support the conviction.

When a defendant challenges the sufficiency of the convicting evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed.2d 560 (1979); see also Tenn. R. App. P. 13(e) (2006) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the finding by the trier of fact of guilt beyond a reasonable doubt."). This standard applies to convictions based upon direct, circumstantial, or a combination of both direct and circumstantial evidence. State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). The State, on appeal, is entitled to the strongest legitimate view of the evidence and all legitimate or reasonable inferences which may be drawn from that evidence. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact, and this court will not reweigh or reevaluate the evidence. State v. Sutton, 166 S.W.3d 686, 689-90 (Tenn. 2005). This court has stated that "[a] guilty verdict by the jury, approved by the trial court, accredits the testimony of

the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." Bland, 958 S.W.2d at 659 (citation omitted). A guilty verdict also "removes the presumption of innocence and replaces it with a presumption of guilt, and the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id. (citation omitted).

The State had to prove beyond a reasonable doubt that the Defendant committed the offense of aggravated robbery. Aggravated robbery is a robbery "accomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon[.]" Tenn. Code Ann. § 39-13-402(a)(1). "Robbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401(a).

Viewed in the light most favorable to the State, the proof fully supports the Defendant's conviction for aggravated robbery. The record shows the victim was robbed at gunpoint by two perpetrators. Alexis Bell was present during the robbery and later identified the Defendant as one of the armed perpetrators of the offense. Aqua Herman testified that the Defendant admitted to being involved in the robbery of the victim and that the guns that were used were in Herman's truck. A gun box matching the same type of gun used in the robbery was seized from the Defendant's mother's home and photographs of the Defendant holding the same type of gun were admitted into evidence. Finally, after waiving her rights under Miranda, the Defendant confessed to the armed robbery of the victim. The Defendant does not dispute that an aggravated robbery occurred in this case. Instead, she points to various inconsistencies within the witnesses' testimony as grounds for relief. As previously noted above, questions involving the credibility of witnesses are matters entrusted to the jury, not this court. Accordingly, we conclude that the evidence is sufficient to support the Defendant's conviction for aggravated robbery.

**III. Sentencing.** As her last issue, the Defendant argues the trial court erred in sentencing her to twelve years' imprisonment, the maximum sentence within her range for the offense. The extent of the Defendant's argument is that the sentence is improper because "there was no explanation as to why the trial court chose [the sentence] . . . [and] no explanation as to why a lower sentence would be improper." As such, the Defendant argues this matter should be remanded for resentencing because the trial court "ignored the principles of sentencing." In response, the State contends, and we agree, that the trial court properly imposed sentence.

We review the length of a sentence imposed by the trial court under an abuse of discretion standard with a presumption of reasonableness. State v. Bise, 380 S.W.3d 682, 708 (Tenn. 2012). "So long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed by the trial court within the appropriate range should be upheld." Id. "If, however, the trial court applies inappropriate mitigating and/or enhancement factors or otherwise fails to follow

the Sentencing Act, the presumption of correctness fails." State v. Carter, 254 S.W.3d 335, 344-45 (Tenn. 2008).

A trial court must consider the following when determining a defendant's specific sentence and the appropriate combination of sentencing alternatives: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the mitigating and enhancement factors set out in sections 40-35-113 and 40-35-114; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and (7) any statement the defendant wishes to make in the defendant's own behalf about sentencing. Tenn. Code Ann. §§ 40-35-210(b)(1)-(7). In addition, "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant should be considered in determining the sentence alternative or length of a term to be imposed." Id. § 40-35-103(5). The court must impose a sentence "no greater than that deserved for the offense committed" and "the least severe measure necessary to achieve the purposes for which the sentence is imposed." Id. §§ 40-35-103(2), (4).

As a Range I, standard offender, the Defendant was subject to a sentencing range of eight to twelve years for aggravated robbery, a Class B felony. See Tenn. Code Ann. §39-13-402(a)(1); see also id. § 40-35-112(a)(3). Thus, the trial court's twelve-year sentence is within the statutory range and presumed reasonable.

There was no evidence other than the presentence report offered at sentencing. The presentence report showed that the Defendant, age 30, had dropped out of high school in the tenth grade. She completed the GED, earned a certification in HVAC, and completed auto mechanics courses. She also had a prior history of criminal convictions consisting of sale or possession of felony drugs, misdemeanor stalking and domestic assault, and a driving related offense. The Defendant reported being in good health and having last used marijuana and Xanax before she was incarcerated. She was previously employed with her parent's lawn business and several retail and fast-food establishments. Finally, as part of her version of the offense, the Defendant stated as follows:

Basically I would like to ask the judge for leniency towards me. I'm being overly charged and the case is from 2014. I've changed drastically in the last 5 years. I'm asking for help. I've never been probated or rehabilitated. I've never been on probation. I did not play the part in this case that the prosecutors are making it out to be. It is a defamation of my character. I don't steal at all. I'm scared to steal a piece of bubblegum. I just ask for another chance with my life because I feel as if I'm being robbed of my tie. The time I'm looking at is outrageous. I know murderers who get lesser time

for robbing someone of their life. I just ask for leniency please and thank you.

Following argument of the parties and prior to imposing sentence, the trial court engaged in a lengthy discussion and noted its application of the appropriate sentencing range, consideration of the presentence report, principles of sentencing, and possible alternatives to incarceration. The trial court also considered the results of the validated risk and need assessment, which determined the Defendant was a low risk. The trial court considered enhancement factor one, that the Defendant had a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range, to be "strong." The court did not find any mitigation factors applied and determined the Defendant had not shown "an ounce of remorse or acceptance of responsibility[.]" The trial court was particularly concerned with the Defendant's comments within the presentence report and characterized her as someone who believed she was "wronged." The trial court then imposed a within range sentence of twelve years' imprisonment.

The Defendant does not identify how the trial court erred in imposing sentence, and her assertion that the trial court failed to provide its reasoning in support of sentencing is belied by the record. Because the Defendant has failed to show an abuse of discretion in the trial court's sentence or otherwise overcome the presumption of reasonableness afforded to a sentence imposed within the applicable range, the judgment of the trial court is affirmed.

## CONCLUSION

Based on the above reasoning and analysis, we affirm the judgment of the trial court.

_____
CAMILLE R. MCMULLEN, JUDGE

12